**Wayne T. FOBAR, Plaintiff,**

v.

**CITY OF DEARBORN HEIGHTS, et al., Defendants.**

No. 97–CV–71430–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 25, 1998.

William A. Roy, Bloomfield Hills, MI, for Plaintiff.

Norman C. Kohlstrand, Dearborn, MI, Jack Timmony, Detroit, MI, for Defendants.

*OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiff Wayne T. Fobar brings this discrimination action under the Americans with Disabilities Act ("ADA") to recover a regular retirement pension. The parties have stipu-

lated to the facts, and now bring Cross–Motions for Summary Judgment.

## II. *FACTS*

The parties have stipulated to the following facts.

Plaintiff Wayne T. Fobar was employed by the City of Dearborn Heights ("City") as a police officer on January 5, 1970. The City of Dearborn Heights Police and Fire Pension Board ("Retirement Board") administered all pensions for the police officers and firefighters employed by the City. The Retirement System was established by the voters of the City, effective July 1, 1965, by the adoption of Public Act 345 of 1937, as amended (M.C.L. § 38.551 et al.) ("Act 345"). Act 345 provides that the Retirement Board shall be a corporate body and is vested with the authority and fiduciary responsibility for the administration, management and operation of the Retirement System. The payment of retirement benefits to members and their beneficiaries is governed by provisions contained in Act 345, applicable collective bargaining agreements, and applicable federal and state law. The Retirement Board many not change the terms of the Retirement System and is vested only with the authority to grant those benefits which are authorized by the provisions of the Retirement System.

This case is brought pursuant to, and jurisdiction is predicated on, 42 U.S.C.A. § 12101 et seq., commonly known as the Americans with Disabilities Act. On June 13, 1995, within 180 days of the date of the discriminatory act complained of, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") encompassing the complaints. On January 31, 1997 the EEOC issued plaintiff a right to sue letter. (Ex. A).

Fobar suffered several injuries while on the job as a Dearborn police officer. The cumulative effect of these injuries was that the Retirement System granted Fobar a duty disability pension effective November 15, 1985. (Ex. B).

Pursuant to Retirement System's rules and procedures and Act 345 Section 6(1)(g), M.C.L.A. § 38.556(1)(g), upon attaining the age of 55 years, a police officer on duty disability pension is converted to a regular disability pension terminating at the death of the officer. The officer is not allowed an election, which includes an automatic 60% surviving spouse pension.

Section 6(2)(d) of Act 345 provides in pertinent part:

> Upon retirement for disability as provided in this subdivision, a member who has not attained 55 years of age shall receive a disability retirement pension of 50% of the member's average final compensation, which shall be determined according to subsection (1)(f), and shall be payable until the member becomes 55 years of age. Upon becoming 55 years of age, the disabled member shall receive a disability retirement pension computed according to subsection (1)(e). In computing the disability retirement pension, the member shall be given service credit for the period of receipt of a disability retirement pension before attainment of 55 years of age. If a member retired after attaining 55 years of age on account of disability, as provided in this subdivision, the member shall receive a disability retirement pension computed according to subsection (1)(e), notwithstanding that the member may not have 25 years of service credit. The disability retirement pension provided for in this subdivision is subject to subdivisions (f) and (g).

Section 6(2)(g) of Act 345 provides:

> Within 60 days before a member becomes 55 years of age, or before retirement from service if retirement occurs after the member becomes 55 years of age, a disabled member who is retired as provided in subdivision (d) or (e) may elect to continue to receive a disability retirement pension as a benefit terminating at death, to be known as a regular disability pension, or may elect to receive the actuarial equivalent, at that time, of a regular disability pension in a reduced disability pension payable throughout life pursuant to an option provided in subsection (1)(h).

Accordingly, a disability retiree, upon attaining age 55, may elect to receive a regular disability pension which terminates upon

death or may elect to receive a reduced disability pension and select an option benefit as provided in Section 6(1)(h) in pertinent part as follows:

(i) Option I. Upon the death of a retired member, his or her reduced retirement pension shall be continued throughout the life of and paid to the person, having an insurable interest in the retired member's life, that the member nominated by written designation duly executed and filed with the retirement board before the effective date of the member's retirement.

(ii) Option II. Upon the death of a retired member, 1/2 of his or her reduced retirement pension shall be continued throughout the life of and paid to the person, having an insurable interest in the retired member's life, that the member nominated by written designation duly executed and filed with the retirement board before the effective date of the member's retirement.

Hence, there are no provisions which entitle a surviving spouse of a disability retiree to receive 60% of the retirement benefits the disability was receiving.

Pursuant to Defendants' rules and procedures and Section 6(1)(h) of Act 345, a regular retiree attaining the age of 55 years is awarded an automatic 60% surviving spouse pension. Regular retirees are permitted to elect options which vary the amount of the surviving spouse pension and the corresponding pension amounts. Section 6(1)(h) of Act 345 provides in pertinent part:

Before the effective date of the member's retirement as provided in this subsection, but not after the effective date of the member's retirement, a member may elect to receive his or her benefit in a pension payable throughout the member's life, called a regular retirement pension, or the member may elect to receive the actuarial equivalent, computed as of the effective date of retirement, of the member's regular retirement pension in a reduced retirement pension payable throughout the member's life, and nominate a survivor beneficiary, pursuant to an option provided in this subdivision. Upon the death of a retirant who retires on or after July 1,

1975, and who is receiving a regular retirement pension, his or her spouse, if living, shall receive a pension equal to 60% of the regular retirement pension the deceased retirant was receiving.

Age and service retirees who elect to receive a regular pension benefit do not have their benefits reduced to provide for the 60% surviving spouse benefit.

Accordingly, a surviving spouse of a retiree who was receiving a regular retirement pension [i.e., having met the age and service requirements (age 50 and 25 years of service) and elected to receive a regular retirement pension], shall receive a pension equal to 60% of the regular retirement pension the deceased retirant was receiving.

On December 13, 1994, prior to his 55th birthday, Fobar submitted correspondence to the Retirement System electing to receive a regular disability pension upon his attainment of age 55. Plaintiff's letter states that he elects a 60% surviving spouse benefit. (Ex. C).

At its meeting of January 18, 1995, the Retirement System resolved to: (1) convert Plaintiff's duty disability pension to a regular disability pension effective January 18, 1995; (2) give Plaintiff an opportunity to elect an Option 1 or Option II; (3) direct Legal Counsel to forward correspondence to Plaintiff noting the inaccuracies of his claims and advising him of his options; and (4) direct the Board's actuary to complete and forward the appropriate calculations to Plaintiff. (Ex. D).

On January 21, 1995, Lt. Gust on behalf of the retirement Board, sent Fobar a letter enclosing an application. (Ex. E). On January 31, 1995, Fobar returned the complete application with a letter of explanation.

The actuary sent the calculations to the Retirement Board with correspondence dated February 8, 1995. (Ex. G). On February 10, 1995, the Retirement Board notified Fobar of the amounts offered under the various elections. (Ex. H). The Retirement Board's Legal Counsel forwarded correspondence to Plaintiff, dated February 10, 1995, advising him that the automatic 60% surviving spouse benefit as contained in Section 6(1)(h) is not

applicable to duty disability retirees. (Ex. I). Fobar elected Option II under a reservation of right. (Ex. I). He receives $1,613.93 per month under this option.

## III. ANALYSIS

### A. ADA Discrimination Claims

The ADA is a federal anti-discrimination statute enacted by Congress to the remove barriers which previously prevented qualified individuals with disabilities from enjoying the same employment opportunities available to non-disabled individuals. 29 C.F.R. Pt. 1630, App. "Like the Civil Rights Act of 1964 that prohibits discrimination on the bases of race, color, religion, national origin, and sex, the ADA seeks to ensure access to equal employment opportunities based on merit. It does not guarantee equal results, establish quotas, or require preferences favoring individuals with disabilities over those without disabilities." *Id.* The irreducible purpose of the Act is to ensure that individuals otherwise qualified for employment opportunities cannot be denied those opportunities on account of their disabilities. 29 C.F.R. Pt. 1630.1(a), App.

#### 1. ADA Title I

■ Plaintiff alleges that the City's failure to provide the automatic 60% surviving spouse benefit to disabled retirees, while providing it to non-disabled employees, violates the ADA's prohibition against discrimination. The discrete issue presented in this portion of the case is whether or not Mr. Fobar, a former employee who was placed on disability because of a physical condition which precluded him from continuing to work as a police officer, is a "qualified individual with a disability" such that he has standing to sue under the ADA.

Title I of the ADA prohibits discrimination "against a qualified individual with a disabili-

ty because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8).[1]

According to the interpretative guidelines, the determination of whether an employee is a "qualified individual with a disability" requires a two step inquiry:

The first step is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. * * * The second step is to determine whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. The purpose of this second step is to ensure that individuals with disabilities who can perform the essential functions of the position held or desired are not denied employment opportunities because they are not able to perform marginal functions of the position. House Labor Report at 55.

29 C.F.R. Pt. 1630.2(m), App. The "essential functions" are those functions which the individual who holds the position must be able to perform, and that could not be removed without fundamentally altering that position. 29 C.F.R. Pt. 1630.2(n), App.

A plain reading of the ADA's definitions indicates that Mr. Fobar is not a qualified individual with a disability because he could not perform "the essential functions of the employment position." In fact, Plaintiff does

---

**1.** This prohibition specifically extends to prevent discrimination in the area of fringe benefits. See, 42 U.S.C.A. § 12112(b), which states:

As used in subsection (a) of this section, the term "discriminate" includes—

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified appli-

cant or employee with a disability to the discrimination prohibited by this subchapter (*such relationship includes* a relationship with an employment or referral agency, labor union, an organization *providing fringe benefits* to an employee of the covered entity, or an organization providing training and apprenticeship programs);.... [Emphasis added].

not dispute that he was granted his disability pension based upon his admission that he was medically disabled from performing the essential functions of a police officer. In support of his application for pension benefits, Plaintiff submitted medical reports confirming that he could no longer carry out his duties, which led the City's Pension Board to adopt the following motion:

> 85–10–273 Motion by Dersa, supported by Peretto, that the Board accept the medical reports which indicate, by a majority opinion that Wayne Fobar is physically incapacitated for further performance of duty as a Police Officer, that the incapacity is likely to be permanent, and Mr. Fobar should be retired.

(Defendants' Brief, p. 3–4). According to the Act's definitions, an employee incapable of performing the essential functions of his or her job is not a qualified individual with a disability. Therefore, as it is undisputed that Mr. Fobar cannot perform the essential duties of his job, he is not a qualified individual with a disability, and is not covered by the ADA.

This interpretation of the plain language of the statute is supported by the Sixth Circuit's decision in *Parker v. Metropolitan Life Insurance Company*, 99 F.3d 181 (6th Cir. 1996),[2] in which a former employee, Ms. Parker, brought an action against her former employer for cutting off long-term disability benefits after two years because her disability was mental rather than physical. Ms. Parker was deemed to be totally disabled and could not perform the essential functions of her job. A portion of the court's ruling held that Ms. Parker did not have standing to sue under Title I because she was not a qualified individual with a disability. In affirming the district court's ruling, the court stated:

> Under the District Court's interpretation of the plain meaning of that statute, Ms. Parker was at no time a "qualified individual with a disability." At the time she could "perform the essential functions" of

her job, she was not disabled for purposes of her long term disability claim, and therefore was not covered by the Disabilities Act, and at the time her insurance benefits were terminated, she could no longer perform her job.

*Parker*, 99 F.3d at 185.

■ It is important to note that in *Parker* the court specifically rejected the argument that because the ADA prohibits discrimination in fringe benefits, and because most long-term disability benefits are reserved for people who are unable to hold substantial employment for which they are qualified, that "virtually no employee could ever challenge discrimination in the provision of long-term disability benefits." *Parker*, 99 F.3d at 186. Fobar makes a similar argument in the instant suit. In *Parker*, the Sixth Circuit faced precisely this issue in rejecting the EEOC's interpretation of the statute in its amicus brief:

> The EEOC states at page twelve of its brief that, "To be covered under Title I of the statute, an employee need only be able to 'perform the essential functions of the employment position that such individual holds or desires.'" (quoting 42 U.S.C.A. § 12111(8)). It then suggests that Ms. Parker is not seeking to invoke the statute to allow her to obtain or retain what one would ordinarily think of as an "employment position." Both sides agree that she cannot continue to work at all. Thus, the Plaintiff and EEOC suggest that she is invoking the statute in an effort to retain the "employment position" of "benefit recipient." The term does not appear anywhere in the statute itself. The concept of an employment position entitled "benefits recipient" appears to be creative thinking on the part of Plaintiff and the EEOC. They argue that the Plaintiff is qualified to hold this position because she has satisfied all the non-discriminatory eligibility criteria by working for Schering, becoming a participant in the LTD plan, and paying her premiums as required.

---

**2.** In *Parker*, rehearing en banc was granted, 107 F.3d 359 (6th Cir.1997), and affirmed after the rehearing, 121 F.3d 1006 (6th Cir.1997). Neither of those decisions disturbed the original panel's disposition of the Title I issues in *Parker v. Metropolitan Life Insurance Company*, 99 F.3d 181 (6th Cir.1996).

Plaintiff's proposed construction of the statute is not persuasive. The concept of "benefits recipient" as an "employment position" relies on a convoluted construction of the statutory language, which conflicts with the plain meaning of the words. Perhaps the drafters of the statute intended that Ms. Parker's situation bring her within the coverage of the Disabilities Act. If that is the case, they failed to provide definitions that lend themselves to doing so. Unfortunately, Congress may not have taken this situation into account. Such an oversight, however, is for Congress to remedy. We should not try to rewrite the statute in a way that conflicts with what appears to be fairly clear language.

*Parker,* 99 F.3d at 187–88. Thus, the ADA, although prohibiting discrimination in the area of fringe benefits, does not apply to people who are no longer able to perform the essential functions of their jobs. *See also, Miller v. Illinois Dept. of Corrections,* 107 F.3d 483 (7th Cir.1997) (correctional officer in medium security prison, who became blind and required a seeing-eye dog and could no longer perform many duties that officers were required to perform, was not qualified individual with a disability and thus was not protected by ADA, even if warden fired her for improper purpose); *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908 (7th Cir.1996) (employee failed to establish that he could perform job with or without reasonable accommodation and, therefore, failed to establish he was "qualified individual" under ADA; employee admitted he could not perform work duties with permanent physical restrictions required by physician, none of requested accommodations was reasonable, and given employee's physical restrictions, no other union positions which employee could have performed were available); *Weiler v. Household Finance Corp.,* 101 F.3d 519 (7th Cir. 1996) (employee was unable to perform essential functions of her position and no accommodation would allow her to do so, and thus she was not "qualified individual with a disability," as required to maintain ADA claim, where employee's psychotherapist informed employer on numerous occasions that employee could not return to work with employer in any position, employee never con-

tacted employer to disagree with that assessment, and she conceded her inability to work in response to request to admit); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755 (5th Cir.1996) (employee who was unavailable for work at time of his discharge due to ankle problems was not able to perform essential functions of his job and, therefore, was not "qualified individual with a disability" within meaning of ADA); *Gonzales v. Garner Food Services, Inc.,* 89 F.3d 1523 (11th Cir.1996) (former employee who was a participant in employer's health plan by virtue of his former employment was not a "qualified individual with a disability" within the meaning of the ADA); *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768, 771 (8th Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988) (court ruled that definition of qualified in the ADA should be interpreted the same as in the Rehabilitation Act, which does not provide protection for employees who are no longer able to do their jobs).

Despite the Sixth Circuit precedent directly refuting his argument, Plaintiff relies upon *Graboski v. Guiliani,* 937 F.Supp. 258 (S.D.N.Y.1996), in which the court rejected the above interpretation of the ADA. In *Graboski,* the defendants contended that the plaintiffs, who were disability retirees, were not covered by Title I because they were unable to perform the essential functions of their former jobs, and that former employees were excluded from coverage. In rejecting the argument the court stated:

Such a crabbed view of the ADA's coverage would undermine the statute's unambiguous remedial purpose. Title I of the ADA expressly prohibits discrimination in the provision of fringe benefits. 42 U.S.C.A. § 12112(b)(2); see also 29 C.F.R. § 1630.4(f). As certain fringe benefits (such as pensions and health insurance continuation) are meaningful only post-employment, it is only logical that the statute's coverage reaches the period when the employment benefits are to be reaped. Moreover, the definition of "employee" under the ADA parallels that under Title VII, 42 U.S.C.A. § 2000e et seq., and was intended to be given the "same meaning."

[Cites omitted]. Under Title VII, "discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct" is actionable. *Pantchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1055 (2d Cir.1978) [other cites omitted]. Accordingly, several courts have held that discrimination in connection with post-employment benefits is actionable by former employees under Title VII. [Cites omitted]. The definition of the term "otherwise qualified" in Title I of the ADA was not intended to distinguish this employment discrimination law from Title VII by abrogating coverage of former employees challenging discrimination arising out of the employment relationship.

*Graboski*, 937 F.Supp. at 266.

Plaintiff further argues that the Supreme Court's recent decision in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), supports the interpretation put forth in *Graboski*. In *Robinson*, the Court was called upon to determine whether § 704(a) of Title VII of the Civil Rights Act, which makes it unlawful for an employer to discriminate against its "employees," includes former employees, such that an employee could bring suit against his employer for post-employment actions allegedly taken in retaliation for the employee having filed suit with the EEOC. *Robinson*, 117 S.Ct. at 845. The Court ruled that while the term "employees" as used in Title VII was ambiguous, the "broader context of Title VII and the primary purpose of § 704(a)" led the Court to hold that former employees are included within the coverage of § 704(a). *Robinson*, 117 S.Ct. at 845.

Presumably, Plaintiff believes that by analogy former employees can sue under the ADA. Assuming arguendo that Plaintiff is correct, that does not, ipso facto, warrant a "revisitation" of the *Parker* decision for three reasons. First, the issue presented here is not simply whether a former employee comes within the definition of "employee," but rather, whether an individual unable to perform the essential functions of his job is a "qualified individual with a disability." In short,

the analogy Plaintiff attempts to draw is tenuous because the Court here must interpret a definition unique to the ADA. Second, absent a clear ruling from the Supreme Court overturning the rationale in *Parker*, this court is bound by the Sixth Circuit's unequivocal decision in that case. That ruling is consistent with the plain language of the statute, the overwhelming majority of case law, and the interpretative guidelines. While other viable interpretations of the statute may exist, the Sixth Circuit's ruling does not fail to give each word in the statute meaning by ignoring the phrase "fringe benefits," as Plaintiff argues. In fact, the Sixth Circuit specifically considered and rejected this argument in the *Parker* decision, and noted that Plaintiff's interpretation of the statute requires a convoluted reading of the statute. Furthermore, the Sixth Circuit's interpretation does not result in a patently absurd interpretation of the statute as Plaintiff contends. Third, unlike the decision in *Robinson*, which was interpreting an ambiguous definition, the definition in the instant case is clear: a "qualified individual with a disability" is an individual with a disability who can perform the essential functions of the employment position in question. *See*, 42 U.S.C.A. § 12111(8). Here, Mr. Fobar does not fit within the definition because he cannot perform the essential functions of a police officer. Therefore, he does not have standing to sue under the ADA because he does not fit within the Act's definition of a qualified individual with a disability.

### 2. ADA Title II

■ Plaintiff also contends that Defendant violated Title II of the Act by discriminating against Plaintiff by denying him the benefit of a 60% surviving spouse pension, which is available to regular retirees but not disability retirees. The discrete issue presented in this portion of the case is whether Mr. Fobar fits under the ADA's definition of a "qualified individual with a disability," i.e., an individual with a disability who meets the essential eligibility requirements for the receipt of the automatic 60% surviving spouse benefit.

Under Title II of the ADA "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132.[3] Under this Title, the term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131(2). In short, an individual with a disability who meets the essential eligibility requirements to receive some benefit cannot be denied that benefit on account of his or her disability or otherwise.

The parties agree that a surviving spouse of a retiree, who is receiving a regular pension because he or she met the age and service requirements (age 55 and 25 years of service), shall receive a pension equal to 60% of the regular retirement pension the deceased was receiving automatically. *See,* § 6(1)(h) of Act 345. According to Defendants, Mr. Fobar has not met the eligibility requirements because he had only 15 years of service before he became disabled. If he had accrued 25 years of service before becoming disabled he would have received the regular retirement pension. Accordingly, the benefit is not denied to any individual who makes the age and service requirements.

Plaintiff contends that he has met the eligibility requirements to receive the automatic 60% surviving spouse pension because under Section 6(2)(d) of Act 345, persons on duty disability pension are given "service credit for the period of receipt of disability retirement pension before attainment of 55 years of age. . . ." But what Plaintiff neglects to mention is that § 6(2)(d) allows service credit toward recovering a disability pension, not the regular pension. Section 6(2)(d) states:

> Upon retirement for disability as provided in this subdivision, a member who has not attained 55 years of age shall receive a disability retirement pension of 50% of the member's average final compensation, which shall be determined according to subsection (1)(f), and shall be payable until the member becomes 55 years of age. Upon becoming 55 years of age, the disabled member shall receive a disability retirement pension computed according to subsection (1)(e). In computing the disability retirement pension, the member shall be given service credit for the period of receipt of a disability retirement pension before attainment of 55 years of age. If a member retired after attaining 55 years of age on account of disability, as provided in this subdivision, the member shall receive

**3.** There has been some dispute over whether or not Title II of the ADA applies to discrimination in employment. Some courts have held that it does not create a separate cause of action for employment related suits, presumably because they can be brought under Title I. *See, e.g., Doe v. University of Maryland Medical Sys., Corp.,* 50 F.3d 1261 (4th Cir.1995); *Decker v. University of Houston,* 970 F.Supp. 575 (S.D.Tex.1997); *Iskander v. Rodeo Sanitary District,* 1995 WL 56578 (N.D.Cal. Feb.7, 1995), aff'd. 121 F.3d 715, 1997 WL 469636 (9th Cir.1997). But a very recent decision by the Eleventh Circuit succinctly and thoroughly explained how the statutory language, the Department of Justice regulations, and several court opinions support the view that Title II does state a cause of action for employment discrimination. *Bledsoe v. Palm Beach County,* 133 F.3d 816 (11th Cir.1998). *See also, McNely v. Ocala Star–Banner Corp.,* 99 F.3d 1068 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1028 (1997); *Wagner v. Texas A & M University,* 939 F.Supp. 1297 (S.D.Tex.1996); *Dertz v. City of Chicago,* 912 F.Supp. 319 (N.D.Ill.1995); *Ethridge v. State of Alabama,* 847 F.Supp. 903 (M.D.Ala.1993); *Finley v. Giacobbe,* 827 F.Supp. 215 (S.D.N.Y.1993).

In this case, Defendants do not contest Plaintiff's argument that Title II creates a cause of action for employment related claims. However, Plaintiff's Complaint does not state a separate cause of action for Titles I and II. Plaintiff stated in a footnote: "The complaint filed in this action does not differentiate between Title I and Title II claims. Fobar has filed a motion to amend his complaint to differentiate these claims, if this court believes such differentiation is necessary." But Plaintiff never filed a motion to amend his Complaint, and, therefore, a differentiation of the claims at the summary judgment stage seems somewhat unfair. However, Defendants do not raise this issue, as they attack Plaintiff's claims by arguing that he did not meet the essential eligibility requirements to receive the 60% surviving spouse pension.

a disability retirement pension computed according to subsection (1)(e), notwithstanding that the member may not have 25 years of service credit. The disability retirement pension provided for in this subdivision is subject to subdivisions (f) and (g).

Mr. Fobar, who retired due to his physical incapacitation in 1985 after only 15 years of service, only qualifies for the disability pension, which does not offer the automatic 60% surviving spouse pension benefit offered under the regular pension.

Ultimately, therefore, the issue is whether it is permissible for a disability retirement plan to provide a lower level of benefits than the same employer's regular retirement plan. While little case law exists on this issue, the EEOC which has received a large number of inquiries regarding the application of the ADA to disability and service requirements, issued a Notice entitled "Questions and Answers About Disability and Service Requirement Plans Under the ADA." EEOC Notice 915.002 (May 5, 1995). The Notice provided the following questions and answers:

> Q. If an employer provides a disability retirement plan, is it permissible under the ADA for that plan to provide lower levels of benefits than the same employer's service retirement plan? Lower benefit levels may take different forms. For example:

> a service retirement plan might enable any employee with 20 or more years of service to retire with an annuity equal to 50% of the individual's highest annual compensation. But, the disability retirement plan, payable when illness or injury prevents the individual from continuing work, might provide an annuity equal only to 45% of the individual's highest annual compensation;

> \*   \*   \*   \*   \*   \*

> A. None of these examples would violate the ADA under any theory of discrimination. The ADA does not require that service retirement plans and disability retirement plans provide the same level of benefits, because they are two separate benefits which serve different purposes.

> Q. Why don't differences in the plans cited above constitute discrimination against a qualified individual with a disability?

> A. There is not disability discrimination because none of the plans make distinctions based on whether or not the individual is covered under the ADA. Thus, in the first example, the service retirement plan is available to all employees who have attained 20 or more years of service. A qualified individual with a disability who works 20 or more years receive the same service retirement benefit as a person not covered by the ADA who works 20 or more years. Similarly, the disability retirement plan is available to everyone who becomes unable to work because of illness or injury. Therefore, the employer does not violate the ADA simply by providing different benefits under service and disability retirement plans

Notice 915,002, p. 2–3.

The EEOC's interpretative guidelines clearly state that retirement systems such as Defendants' do not violate the ADA by providing lower pension benefits under its disability pension plans. The rationale underlying that determination is that the disabled employee is not receiving lower benefits because of his disability, but because he failed to meet the essential age and service eligibility requirements for receiving those benefits.

In *Graboski v. Guiliani*, 937 F.Supp. 258 (S.D.N.Y.1996), the court squarely addressed the same issue presented here. In *Graboski*, the plaintiffs were retired disabled firemen who were excluded from Variable Supplemental Benefits (retirement benefits) available only to plan beneficiaries who retired "for service," thus excluding disability retirees. The plaintiffs contended that the exclusion of disability retirees from eligibility for retirement benefits constituted discrimination. Citing EEOC Notice 915.002, the court ruled in favor of the defendant, stating:

> Under these EEOC guidelines, the VSF statutes facially are compatible with Title I of the ADA. There is no dispute that firefighter retirees who have served at least twenty years and are disabled have the option to choose either retirement for service or the category of disability retire-

ment for which he or she is qualified. The eligibility for VSF payments accompanying retirement for service on or after October 1, 1968 thus is available on equal terms to persons who have disabilities and those who do not. Consequently, the CODE is not discriminatory.

In the instant case, all employees, including disabled employees, may qualify for the regular pension so long as they meet the age and service requirements. Thus, because the City's pension program does not treat employees with disabilities any differently than other employees, the program does not discriminate.[4]

The *Graboski* court also noted that, given the reasonability of the EEOC's interpretation of the statute in Notice 915.002, the court was bound to lend deference to that interpretation:

> This Court is bound to defer to reasonable interpretations of Title I of the ADA proffered by the EEOC, the regulatory agency charged with its administration. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). There is nothing unreasonable about the EEOC's view. It gives effect to one of the primary goals of the ADA—eradicating the exclusion of people with disabilities from opportunities afforded to persons without disabilities. [Footnote omitted] See 42 U.S.C.A. § 12112(b)(1)–(7) (defining various forms of discrimination that operate to exclude to persons with disabilities from employment-related opportunities and benefits); id. § 12132 (focus on exclusion from benefits of services, programs or activities of a public entity). All persons—disabled or not—who have served twenty years are eligible to retire on a basis that would include entitlement to VSF payments. No one who has served less than twenty years may retire on a basis that does so. That is not actionable discrimination.

*Graboski*, 937 F.Supp. at 268. *See also, Felde v. City of San Jose*, 839 F.Supp. 708

(N.D.Cal.1994), *aff'd*, 66 F.3d 335, 1995 WL 547698 (9th Cir.1995) (the plaintiff was not discriminated against because he had been afforded the option to receive the contested benefit on the same terms available to others without disabilities). This Court finds the EEOC's interpretation of the statute logically sound, and shows substantial deference to that interpretation. As such, the Court rules that the City's retirement system does not violate Title II of the ADA because the system does not discriminate on the basis of disability.

### IV. CONCLUSION

Therefore, because, as a matter of law, Plaintiff's claims do not constitute discrimination in violation of the ADA, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED. The case is DISMISSED WITH PREJUDICE.

---

4. Although the above passage from *Graboski* refers to Title I of the Act, as opposed to Title II, the logic is nonetheless applicable as the issues are identical. Furthermore, as is apparent from Plaintiffs Complaint, which fails to separate his Title I and Title II claims, there is an abundance of confusion surrounding which section claims such as Plaintiff's fall under.