Kevin L. BASS, et al., Plaintiffs,

v.

THE CITY OF ORLANDO,
et al., Defendants.

No. 98–199–Civ–Orl–22C.

United States District Court,
M.D. Florida,
Orlando Division.

April 16, 1999.

---

Thomas J. Pilacek, Thomas J. Pilacek and Associates, Maitland, FL, for plaintiffs.

Daniel P. O'Gorman, Garwood, McKenna, McKenna & Wolf, P.A., Orlando, FL, for defendants.

### ORDER

CONWAY, District Judge.

This cause comes before the Court for consideration of Defendants City of Orlando ("City") and Orlando Police Pension Board of Trustees' ("Board") Motion for Summary Judgment (Doc. 34) and Plaintiffs Kevin L. Bass, Alan L. Bruno, Kevin

Coughlin, Michael M. Louis, Jr., Joseph Morales, John F. Overman, Barbara Renee Pierstorff, and Millie Sue Ricks' Motion for Partial Summary Judgment (Doc. 31).

### I. Facts [1]

In 1943, pursuant to a Special Act, the Florida Legislature created the Orlando Police Pension Fund ("Fund" or "plan") to provide retirement benefits to qualified members of the Orlando Police Department. Prior to its amendment in 1995, the Fund did not provide for a cost-of-living adjustment ("COLA") for pension benefits. Therefore, the Fraternal Order of Police, Labor Lodge 25 ("Union"), a union representing the officers and sergeants of the Orlando Police Department, sought a 2% COLA for retirees who served 20 or more years and were at least 55 years old and for retirees who received a line-of-duty disability pension from the Fund. The Union and the City agreed that the actuarially-determined cost of the COLA would be borne by the plan members. To accomplish this, the City and the Union discussed certain offsets to disability pension payments for subsequent earned income and workers' compensation payments received by the pensioner. The Union's stated purpose for the offsets was to "reduce the overall cost of the COLA" and to "reduce any incentives within the pension plan for persons to apply for disability pensions who could continue to serve until normal retirement." The estimated initial cost to the plan members of the COLA benefits without the offsets would be 4.19% of the officers' salaries, and 3.33% with the offsets. Therefore, the offsets to the disability plan benefits reduced the contributions during employment for all plan members. The contributions are then placed into a common fund used to pay both disability and service pension benefits.

---

1. The facts have been stipulated to by all parties in their Stipulation of Undisputed Facts in Support of Plaintiffs' and Defendants' Motions for Summary Judgment (Doc. 33).

On October 12, 1994, the Union informed the bargaining unit members of the proposed offsets. The COLA plan and the proposed offsets were ratified by the Union on October 20, 1994 by a vote of 171 to 84. Subsequently, on July 1, 1995, the Florida Legislature enacted the COLA plan and offsets as a Special Act, Chapter 95–482, Laws of Florida.

Section 6 of the Special Act provides for a service pension for officers who have served at least twenty years in the Orlando Police Department. Section 7 provides for a less favorable service pension for officers who have served at least ten years. Section 9 provides for a line-of-duty disability pension for officers who become "permanently and totally disabled" in the line of duty. Section 10 provides for a disability pension for officers who become "permanently and totally disabled" outside the line of duty. An officer may select any pension as long as the officer satisfies the pension's requirements.

Line-of-duty disability pension benefits are calculated as though the officer had completed twenty-five years of service, which is 80% of the officer's average salary over the previous three years. Section 8(4) states that if a disability pensioner receives both a disability pension payment and workers' compensation payment from the City in the same month, the monthly pension would be offset by the amount of the monthly workers' compensation payment. However, the monthly pension would not be reduced below 100% of the police officer's salary earned on the officer's last day of work for the City. For purposes of the offset calculation, when lump sum workers' compensation settlements are paid, the lump sum is amortized over the period of allowable benefits, not to exceed ten years. No offsets are made if the member is receiving benefits under the Social Security Act as disabled.

Payments to a disability pensioner for attorney's fees and for past medical expenses incurred by the pensioner as part of the workers' compensation claim are excluded from the offset provisions. Future medical expenses that are part of a workers' compensation award or settlement are included in the calculation of offsets at the commencement of a line-of-duty disability pension. If that inclusion reduces the retiree's pension, the retiree's actual out-of-pocket medical expenses directly related to the medical condition giving rise to the retirement would, on an annual basis, be prospectively credited to the retiree's pension thereby causing an upward adjustment of the pension. The period of adjustment would be only during the 10–year amortization period of other lump sum workers' compensation benefits and would be limited, in any one year, to the amount the pension might have been reduced due to the inclusion of the lump sum medical payments in the offset. However, any remaining medical payments incurred during that year would be offset the following year.

The Special Act also provides in Section 8(5) that disability pension benefits would be reduced, in the succeeding calendar year, by $1.00 for every $3.00 of "earned income" during any period for which disability payments were payable; provided, however, that benefits payable under the plan would never be reduced below the amount the disability retiree would have been eligible to receive on the date of retirement, based on the retiree's years of credited service and average monthly salary at the time of disability. Officers receiving a service pension are not required to have their benefits reduced by amounts earned as compensation from other employment or by any amount of workers' compensation payment during the term in which benefits are provided.

Plaintiffs are former City police officers who are receiving a line-of-duty disability pension under the Act. They were unable to perform the essential functions of the position of police officer, with or without reasonable accommodations, at the time they retired from the City. In 1997, Plaintiffs filed a single charge of discrimination

with the Equal Employment Opportunity Commission ("EEOC") challenging the plan. The EEOC issued a Dismissal and Notice of Rights on November 26, 1997.

Plaintiffs subsequently filed a three-count complaint in this Court on February 23, 1998. (Doc. 1). Plaintiffs assert in Count I that Sections 8(4) and (5) of Chapter 95–482, Laws of Florida, violate Title I of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq. Id.* Plaintiffs claim in Count II that Section 8(4) violates the due process clause of the Fourteenth Amendment to the United States Constitution. *Id.* Finally, Count III alleges that Section 8(4) violates the Florida Workers' Compensation Law, Fla. Stat. §§ 440.01–440.60. *Id.* Plaintiffs voluntarily dismissed Count II on November 30, 1998. (Doc. 20). Thereafter, on February 23, 1999, the Court declined to exercise supplemental jurisdiction over Count III because those claims raised novel and complex issues of Florida law. (Doc. 23).

## II. Standard for Motion for Summary Judgment

Summary judgment is appropriate only when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In making this determination, the Court must view all of the evidence in a light most favorable to the nonmoving party. *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The moving party has the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Next, the "non-moving party ... bears the burden of coming forward with sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). To that end, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file', designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

## III. Analysis

The parties have filed cross motions for summary judgment. Defendants argue that summary judgment is appropriate because Plaintiffs cannot establish that they are qualified individuals with a disability as defined by the ADA and because the Special Act does not discriminate against disabled persons.[2] Plaintiffs assert that the workers' compensation and earned income offsets violate the ADA because disabled officers are required to fund the COLA in a greater amount than non-disabled officers. In other words, the disabled officers are ultimately required to provide a larger contribution to the Fund than non-disabled officers who participate in the plan.

### A. Qualified Individuals With a Disability

Title I of the ADA prohibits a covered entity from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate" includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes ... an organization providing fringe benefits)." 42 U.S.C. § 12112(b)(2). A "qualified" individual is "an individual with a disability who, with

---

**2.** In their motion, Defendants also contend that Plaintiffs failed to exhaust administrative remedies regarding offsets for workers' compensation benefits. However, Defendants subsequently withdrew this argument. (Doc. 38).

or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It is undisputed that Plaintiffs were unable to perform the essential functions of the position of police officer, with or without reasonable accommodations, at the time they retired. (Doc. 33, ¶ 16). The issue, therefore, is whether Plaintiffs nevertheless fall within this definition.

The Eleventh Circuit in *Gonzales v. Garner Food Serv., Inc.*, 89 F.3d 1523 (11th Cir.1996), *cert. denied, Wood v. Garner Food Serv., Inc.*, 520 U.S. 1229, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997), addressed a similar issue. In that case, the appellant participated in an employer-sponsored group welfare benefit plan that provided health insurance coverage up to a $1 million lifetime limit. *Id.* at 1524. After the appellant was diagnosed with AIDS, the employer discharged him to avoid paying future health insurance claims. *Id.* The appellant paid the necessary premiums to continue his health insurance benefit coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). *Id.* Thereafter, the employer amended the plan to cap AIDS-related treatment. *Id.*

The appellant filed a complaint alleging that the employer discriminated against him by imposing the cap in violation of Title I of the ADA. *Id.* One of the issues the Eleventh Circuit considered was whether the appellant was a "qualified individual with a disability." *Id.* at 1525–26. The court held that he was not a "qualified individual with a disability" because "he neither held nor desired to hold a position with [the employer] at or subsequent to the time the alleged discriminatory conduct was committed. Rather [the appellant] was a participant in the health benefit plan only by virtue of his status as a former employee." *Id.* at 1526.

In making its determination, the court addressed the appellant's contention that "since the fruits of many fringe benefits are realized during the post-employment period, Congress must have intended former employees to be protected under the ADA as well." *Id.* The court rejected this argument stating that "a review of both the ADA and its legislative history suggests that Congress intended to limit the protection of Title I to either employees performing, or job applicants who apply and can perform, the essential functions of available jobs which their employers maintain." *Id.* at 1527.

The court also considered whether Title VII case law was instructive on this issue. *Id.* In this regard, the Eleventh Circuit acknowledged that it had previously extended the class of protected persons under the Title VII retaliation statute, 42 U.S.C. § 2000e–3, to include former employees. *Id.* In that context, the court reasoned:

> "While it is true that the language of a statute should be interpreted according to its ordinary, contemporary and common meaning ... this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute. In the instant case, a strict and narrow interpretation of the word 'employee' to exclude former employees would undercut the obvious remedial purposes of Title VII."

*Id.* (quoting *Bailey v. USX Corp.*, 850 F.2d 1506, 1509 (11th Cir.1988)). However, in the context of the ADA, the court found no clearly expressed legislative intent suggesting that former employees should be covered. *Id.* at 1528. In addition, the court explained that:

> excluding former employees from protection under [the ADA] is not inconsistent with the policies underlying the statute. To the contrary, interpreting the ADA to allow any disabled former employee to sue a former employer essentially renders the [qualified individual with a disability] requirement under the Act, that an individual with a disability hold or desire a position the essential

functions of which he or she can perform, meaningless.

*Id.* at 1529. Therefore, the court concluded that the appellant, a former employee, was not a "qualified individual with a disability" as defined under the ADA. *Id.* at 1530.

Other circuit and district courts have disagreed with the holding in *Gonzales. See, e.g., Ford v. Schering–Plough Corp.,* 145 F.3d 601 (3d Cir.1998) (stating that the Eleventh Circuit "failed to address the possibility that the disparity between the rights created by the ADA and the apparent legal remedy fashioned by the ADA creates an ambiguity in the eligibility requirements for obtaining a remedy"), *cert. denied,* —— U.S. ——, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999); *Castellano v. City of New York,* 142 F.3d 58 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998); *Conners v. Maine Medical Center,* No. 42 F.Supp.2d 34 (D.Me.1999). These courts have noted that *Gonzales* was decided prior to the Supreme Court's decision in *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). *Ford,* 145 F.3d at 607; *Castellano,* 142 F.3d at 68; *Conners,* at 44–45. In *Robinson,* the Court held that the term "employees" as used in Title VII's retaliation provision, 42 U.S.C. § 2000e–3(a), includes former employees. *Robinson,* 519 U.S. at 346, 117 S.Ct. 843. The courts in *Ford, Castellano,* and *Conners* found that the Court's decision in *Robinson* lends support for interpreting Title I of the ADA to permit suits by disabled individuals against their former employers concerning disability benefits. *Ford,* 145 F.3d at 606; *Castellano,* 142 F.3d at 68; *Conners,* at 42–43. However, the Eleventh Circuit in *Gonzales* specifically addressed the anti-retaliation provision under Title VII and concluded that the rationale of extending protection to former employees is inconsistent with the policies and language of the ADA. *Id.* at 1528–29.

Plaintiffs assert that *Gonzales* is distinguishable from the instant case for the following reasons: (1) Plaintiffs were entitled to the pension during their employment because they became "disabled" within the meaning of the ADA during the course of their employment but nevertheless continued to perform the essential requirements of their job with or without a reasonable accommodation, until they became completely and totally disabled; and (2) the discrimination occurred when the Special Act was passed, not when Plaintiffs actually retired.[3] The Court finds these arguments to be unavailing.

Plaintiffs submit only the affidavit of Michael Louis in support of the first argument. Louis states that his disability occurred in 1991, but that he continued "to attempt to work, on and off, with various degrees of success and in extreme pain until December 4, 1995. On December 5, 1995, [he] had fusion surgery on [his] vertibrae (sic), as the result of which [his] physician could not release [him] to return to employment as a police officer." He then retired and received a line-of-duty disability pension. This affidavit is vague in that it fails to explain what the essential functions of the job were or whether he could perform them with or without reasonable accommodations.

■ Even if Plaintiffs can demonstrate that they were qualified individuals with a disability during their employment, the alleged discriminatory conduct did not occur until they retired and received a pension. Although Plaintiffs contend that the discriminatory conduct occurred in July 1995, when the Special Act was passed, they do not claim that they were discriminated against at that time. Plaintiffs do not allege that the City offered discriminatory pension plans or charged higher prices during their employment. In addition,

---

**3.** Plaintiffs also assert that the form of the benefit was different in *Gonzales.* However, in this case, the Court finds the difference to be irrelevant.

Plaintiffs do not contend that the City varied the terms of the plan depending on whether or not the employee was disabled. During their employment, all employees were offered the same options and contributed the same amounts. Therefore, because Plaintiffs do not assert that they were individually discriminated against during their employment, their claims of discrimination did not accrue until they were awarded a line-of-duty disability pension. At that time, Plaintiffs were unable to perform the essential functions of their jobs with the City, with or without reasonable accommodations. Because the ADA is limited to job applicants and current employees capable of performing the essential functions of available jobs, Plaintiffs are not qualified individuals with a disability. *See also Equal Employment Opportunity Commission v. CNA Insurance Companies*, 96 F.3d 1039 (7th Cir. 1996) (where former employee challenged employer's decision to reduce the long-term benefits available for mental health problems, the court found that because a former employee had no employment position, she could not prevail on her ADA claim); *Fennell v. Aetna Life Ins. Co.*, 1999 WL 118294 (D.D.C., February 26, 1999) (in a challenge to employer's policy of providing a shorter duration of disability benefits for mental disability, the court held that because plaintiff could no longer perform the essential functions of her job with or without reasonable accommodations, she did not fall within the coverage of the ADA).

### B. *Discriminatory Employment Practice*

██ In their motion for summary judgment, Plaintiffs assert that the plan violates the ADA because disabled pensioners are required to fund a COLA for themselves and for non-disabled service pensioners in a disproportionate amount; therefore, the plan requires higher contribution levels by disabled employees to obtain the same benefits as non-disabled employees. Defendants contend that Plaintiffs are arguing that they should be entitled to the same pension as service retirees, that is, a pension without offsets. In addition, Defendants argue that Plaintiffs have failed to demonstrate that they are treated worse than similarly situated non-disabled officers or that "but for" their alleged disabilities they would be treated better. For the following reasons, the Court finds that the plan does not discriminate against disabled pensioners in violation of the ADA.

The EEOC has determined that plans similar to the one in this case do not violate the ADA. The EEOC explains that "[t]he ADA does not require that service retirement plans and disability retirement plans provide the same level of benefits, because they are two separate benefits which serve different purposes." EEOC Notice, "Questions and Answers about Disability Service Retirement Plans Under the ADA," No. 915.002, May 11, 1995 (Doc. 34, Exh. B). Examples of plans that do not violate the ADA, but offer lower benefit levels are as follows:

(1) "a service retirement plan might enable any employee with 20 or more years of service to retire with an annuity equal to 50% of the individual's highest annual compensation. But, the disability retirement plan, payable when illness or injury prevents the individual from continuing work, might provide an annuity equal only to 45% of the individual's highest annual compensation;"

(2) "service retirees might receive periodic increases (for example, based on inflation or an increased return on invested pension funds) while disability retirees remain at a fixed benefit level;"

(3) "a service retirement plan might disregard outside earnings while a disability retirement plan contains an outside earnings offset provision."

*Id.* The EEOC remarked that these types of plans do not violate the ADA because "none of the plans made distinctions based

on whether or not an individual is covered under the ADA." *Id.*

On the other hand, according to the EEOC, some examples of plans that would violate the ADA are as follows:

(1) "persons covered by the ADA who qualify for both a service retirement and disability retirement plan are required to take a disability benefit which is less advantageous;"

(2) "an employer requires persons covered by the ADA to serve 25 years to obtain a service retirement benefit, while persons not covered by the ADA are eligible for service retirement after 20 years;"

(3) "persons covered by the ADA who earn a service retirement benefit are given a cost of living increase every third year of retirement, while all other service retirees receive an annual cost of living increase[.]"

*Id.*

Several other courts have addressed similar issues. In *Castellano v. City of New York*, 142 F.3d 58 (2d Cir.1998), the plaintiffs, who were retired police officers and firefighters, challenged a pension plan because only "for service" retirees received variable supplemental funds in addition to regular pension benefits. *Id.* at 62. With respect to disabled retirees who had less than twenty years of service, the court stated that these individuals are similarly situated with non-disabled retirees who retire after an equivalent period of service. *Id.* at 70. Therefore, because the latter group is not entitled to the supplements, the court found no unlawful discrimination. *Id.* The court reasoned that the "ADA requires only that persons with disabilities have the opportunity to receive the same benefits as non-disabled officers who have given an equivalent amount of service." *Id.* In addition, the court held that because the supplemental payments were available equally to individuals with or without disabilities who retired after twenty years of service, the plaintiffs failed to state a claim of discrimination. *Id.*

The retirement plan in *Felde v. City of San Jose*, 66 F.3d 335, 1995 WL 547698 (9th Cir.1995), allowed disabled firefighters the option of choosing a regular service retirement or a disability retirement. *Id.* at *1. Under the regular service retirement, a firefighter who served at least 20 years and accrued unused sick leave in excess of 1,680 hours was entitled to a 100% sick leave payout. *Id.* If the individual chose another retirement plan or did not meet the qualifications, the sick leave payout was capped at 80%. *Id.* Even though the plaintiff was eligible for a regular service plan, he voluntarily applied for a service-connected disability retirement, which caused his sick leave payout to be capped at 80%. *Id.* The Ninth Circuit found that the plan did not violate the ADA because it provided "a disabled firefighter with all the retirement options offered to non-disabled firefighters and additionally allow[ed] only disabled firefighters the choice of electing disability retirement." *Id.* at *2.

Finally, in *Fobar v. City of Dearborn Heights*, 994 F.Supp. 878 (E.D.Mich.1998), the court considered whether a disability retirement plan that provided a lower level of benefits than the regular retirement plan violated Title II of the ADA. *Id.* at 881. The service pension allowed for a 60% surviving spouse benefit, but the disability pension did not. *Id.* The court ultimately held that the plan did not discriminate because all employees, including disabled employees, might have qualified for the regular pension as long as they met the age and service requirements. *Id.* at 887.

Based on the reasoning of these cases and the examples given by the EEOC, the Court finds that the plan does not discriminate against the disabled pensioners. These authorities recognize that differences between the benefits offered in service pensions and disability pensions are permissible. A retirement plan is discriminatory if, for example, it pays disabled service pensioners less than non-disabled

service pensioners, or if disabled pensioners are required to choose a less advantageous pension although they qualify for both a disability and a service pension. Although the plan at issue in this case offers a lower benefit level for the disabled pensioners, it does not make distinctions based on whether or not an individual is covered under the ADA. For example, each officer contributes the same percentage of his salary to the Fund and is offered the same opportunities. In addition, any officer who becomes disabled and who qualifies for the service pension may choose either the service pension or the disability pension.

The Court further finds that Plaintiffs are not treated differently from similarly situated officers. Officers who are similarly situated to Plaintiffs are non-disabled officers who retired with the same length of service as Plaintiffs. Because the plan provides a COLA only for those officers who retire after 20 years of service or who are disabled, officers who are similarly situated to the disabled officers are not entitled to a COLA. Therefore, because Plaintiffs are not treated differently from similarly situated officers, the plan does not unlawfully discriminate. The "ADA requires only that persons with disabilities have the opportunity to receive the same benefits as non-disabled officers who have given an equivalent amount of service." *Castellano,* 142 F.3d at 70. In this case, Plaintiffs receive better benefits.

Plaintiffs argue that plan discriminates because they are required to make additional contributions to the fund after retirement whereas others are not. However, service pensioners, for the most part, contribute more to the fund than disabled pensioners because they serve more time than the disabled pensioners. Likewise, non-disabled officers who retire before they are entitled to a service pension contribute a percentage of their salaries, but do not receive any benefit. Therefore, the Court is not persuaded by Plaintiffs' argument.

In further support of their assertions, Plaintiffs rely on *City of Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), and *Arizona Governing Committee For Tax Deferred Annuity and Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983). In *Manhart,* the Supreme Court held that an employment practice that required female employees to make larger contributions to a pension fund than male employees because females live longer was discriminatory under Title VII. *Id.* at 711, 98 S.Ct. 1370. In *Norris,* a class action suit under Title VII was brought challenging the state's deferred compensation plan. *Id.* at 1076, 103 S.Ct. 3492. The companies selected by the state to participate in the plan used sex-based mortality tables to calculate monthly retirement benefits. *Id.* at 1077, 103 S.Ct. 3492. Because the tables classified annuitants on the basis of sex and because women on average live longer than men, men received larger monthly payments than women who deferred the same amount and retired at the same age. *Id.* The Supreme Court held that "[a]n individual woman may not be paid lower monthly benefits simply because women as a class live longer than men." *Id.* at 1085, 103 S.Ct. 3492. Thus, the Court concluded that "it is just as much discrimination 'because of ... sex' to pay a woman lower benefits when she has made the same contributions as a man as it is to make her pay larger contributions to obtain the same benefits." *Id.* at 1073, 103 S.Ct. 3492.

*Manhart* and *Norris* are distinguishable from the instant case. In *Manhart,* female employees were required to make larger contributions to the pension fund. In this case, as the Court previously noted, all officers contributed the same percentages from their salaries to the fund. In *Norris,* females were given lower monthly retirement benefits than similarly situated males. In that case, females were treated differently although they were receiving

the same pension. In the instant case, however, the employer offers two separate pensions that serve different purposes, and neither plan is offered on a discriminatory basis. For example, disabled officers who elect a service pension are not paid less than non-disabled officers who also receive a service pension. Therefore, because the plan does not make distinctions based on whether or not an individual is disabled, the Court concludes that it does not violate the ADA.

## IV. Conclusion

Based on the foregoing, it is ORDERED as follows:

1. Defendants' Motion for Summary Judgment (Doc. 34), filed December 1, 1998, is GRANTED insofar as it seeks judgment as a matter of law on Count I. In all other respects, it is DENIED AS MOOT.

2. Plaintiffs' Motion for Summary Judgment (Doc. 31), filed December 1, 1998, is DENIED.

3. The Clerk is directed to enter judgment in favor of Defendants providing that Plaintiffs shall recover nothing on their claims against Defendants and that Defendants shall recover costs.

4. This case is removed from the April 1, 1999 trial calendar.

5. All pending motions are denied as moot.

6. The Clerk is directed to close this case.