Joseph L. CONNERS, Plaintiff,

v.

**MAINE MEDICAL CENTER and UNUM Life Insurance Company of America, Defendants.**

No. Civ. 98–273–P–C.

United States District Court, D. Maine.

March 3, 1999.

Jon Holder, Holder & Grover, Portland, Maine, for plaintiff.

William J. Kayatta Jr., Peter H. Jacobs, Pierce Atwood, Portland, Maine, for MMC.

Patricia A. Peard, Bernstein, Shur, Sawyer & Nelson, Portland, Maine, for UNUM Life Insurance.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Before the court are cross motions for summary judgment filed in an action brought by Plaintiff, Mr. Joseph Conners, against Defendants, Maine Medical Center ("MMC") and UNUM Life Insurance Company of America ("UNUM"). Mr. Conners filed a four-count Amended Complaint alleging that the Long Term Disability Plan ("LTD Plan") available to MMC employees violates the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Maine Human Rights Act, 5 M.R.S.A. § 4572 ("MHRA"), by providing a two-year cap on benefits for mental disabilities, but not for physical disabilities, and that Defendants' refusal to pay benefits beyond the two-year period was a wrongful denial of disability benefits in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").

## I. BACKGROUND

MMC gives employees the option to participate in its LTD Plan, which is funded solely through employee contributions. UNUM acts as the disability claims administrator, meaning that UNUM considers employees' claims for benefits under the LTD Plan, determines whether such claims are valid, and pays out benefits for valid claims. Maine Medical Center Long Term Disability Plan Affidavit of Stella M. Fohlin ("Fohlin Affidavit") (Docket No. 21), Attachment A at 27–28. If a claim is denied, employees may appeal to UNUM and UNUM shall make the final decisions regarding claims for benefits. *Id.*

Since 1988, MMC has maintained an LTD Plan funded by an insurance policy that MMC purchased from UNUM, a company which sells a variety of insurance products to employers and other entities. *Id.* ¶ 4. The LTD Plan is open to all employees, disabled and nondisabled alike. Under the LTD Plan, benefits for total physical disability may be paid out until the recipient reaches age sixty-five. *Id.* For disabilities caused by mental or nervous conditions, benefits are limited to twenty-four months, with an additional ninety-day coverage if the recipient is hospitalized on the date benefits would otherwise expire. *Id.* at 19. The language of the LTD Plan was approved by the Maine Bureau of Insurance in 1995. *Id.* ¶ 7. While an employee of MMC, Mr. Conners enrolled in the LTD Plan.

Mr. Conners worked for MMC as an electrician beginning in October of 1978. Fohlin Affidavit, Attachment B at 13. As a result of two tours in the Vietnam War, Mr. Conners suffers from post-traumatic

stress disorder and severe depression and anxiety. *Id.* at 8, 11, 17, 45–52, and 68–72. He was diagnosed as having this condition by a physician in October 1993. *Id.* at 8. As a result of his illness, Mr. Conners has trouble concentrating, feels anxious and distracted, and cannot function at work. *Id.* at 8, 11, 17, 45–52. Mr. Conners' physician prescribed him mind-altering drugs for the depression and anxiety and advised him not to work while taking the medication. *Id.* at 8, 11, and 17. Mr. Conners has been unable to work since October 27, 1993, and in April 25, 1994, Mr. Conners filed an application for LTD benefits with UNUM. *Id.* at 5–13.

In May of 1994, UNUM approved Mr. Conners' application for disability benefits. *Id.* at 21–22. Mr. Conners was notified on June 27, 1994, in writing that he was subject to the twenty-four month limitation on benefits because he suffered from a disability caused by a psychiatric disorder. *Id.* at 32–33. After additional correspondence not relevant here, Mr. Conners was reminded on January 24, 1996, that in order to receive disability benefits beyond the two-year term, he would have to submit evidence that he was physically disabled. *Id.* at 89–80. Mr. Conners complained to UNUM that he had not been aware of the two-year limitation on mental disability benefits when he enrolled in the LTD Plan and that he wished to submit evidence to show that he was physically disabled. *Id.* at 81–83. In addition, Mr. Conners complained to the Maine Bureau of Insurance that the UNUM policy was discriminatory. *Id.* at 84–87.

Despite Mr. Conners' attempt to show that the disability from which he suffered was physical and his complaint that the LTD Plan was discriminatory, Mr. Conners was notified on April 17, 1996, that his disability benefits would be terminated on April 26, 1996. *Id.* at 111–12. A year later on April 24, 1997, Mr. Conners filed an appeal, *id.* at 117, which was denied by UNUM on May 30, 1997. *Id.* at 126–27. Again, UNUM explained that Mr. Conners

was not eligible for benefits beyond twenty-four months because his disability was caused by a mental disorder. *Id.;* Plaintiff's Statement of Facts Not in Dispute (Docket No. 25), Exhibit 6. Mr. Conners appealed for a second time, contending that the distinction between mental and physical disabilities was against the law. *Id.* at 130; Plaintiff's Statement of Material Facts Not in Dispute, Exhibit 13. UNUM denied Mr. Conners' request that it designate his disability as physical, for the final time, by letter on June 5, 1997. *Id.* at 131–32; Plaintiff's Reply Memorandum to Defendants' Joint Objection to Cross Motion for Summary Judgment, (Docket No. 30), Exhibit A.

On April 25, 1997, MMC informed Mr. Conners that his employment had been terminated in April of 1996, according to the LTD Plan policy that once LTD benefits are terminated and the employee does not return to work, employment is suspended. Plaintiff's Reply Memorandum to Defendants' Joint Objection to Cross Motion for Summary Judgment, Exhibit C. In this letter MMC explained that the termination of disability benefits and, thus, Mr. Conners' employment, meant that MMC no longer contributed to his pension. *Id.* Upon receiving this letter, Mr. Conners filed an appeal that was denied by a letter from the Maine Medical Center in December of 1997. Plaintiff's Statement of Facts Not in Dispute, Exhibit 2. In October of 1997, Mr. Conners filed a complaint with the Maine Human Rights Commission. *Id.,* Exhibit 5 at 2. On April 15, 1998, the Maine Human Rights Commission issued a report favorable to Mr. Conners and recommended that the Commission conclude that unlawful discrimination against Mr. Conners had occurred. *Id.,* Exhibit 5. On July 20, 1998, Mr. Conners filed this action in state court. Defendants's Statement of Facts As to Which There is No Dispute (Docket No. 22), ¶ 1. UNUM and MMC removed the action to this Court in July of 1998, and Mr. Conners filed an Amended

Complaint in this Court in October of 1998 (Docket No. 12).

## II. DISCUSSION

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 317, 322, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986).

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). The court will not, however, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact emerges, then the motion for summary judgment may be granted. Because the facts in this case are not in dispute, the Court's analysis focuses on the legal questions raised by the parties in their cross motions for summary judgment.

### A. The ADA.

In Count I of his Amended Complaint, Mr. Conners alleges that the LTD Plan violates Title I of the ADA because of the disparity in benefits between mental and physical disabilities. Title I proscribes discrimination in the terms and conditions of employment and mandates in relevant part:

(a) General rule

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). In Count II of his Amended Complaint, Mr. Conners alleges that the LTD Plan violates Title III of the ADA. Title III of the ADA provides:

(a) General rule

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Mr. Conners claims that the Defendants violated Title I and Title III of the ADA because the disparity in the duration of the benefit program for a mental versus a physical disability constitutes discrimination against him on the basis of his mental disability. Defendants raise several objections to Mr. Conners' claims including that Mr. Conners does not have standing to assert his claim, that his claims are not timely, and that disability plans that provide fewer benefits for a mental disability than for a physical disability are not unlawful under the ADA.

1. *Eligibility to Sue Under Title I: Disabled Former Employee's Ability to Sue as a Qualified Individual with a Disability.*

Under the ADA, an employer may not discriminate against a "qualified individual with a disability" on the basis of that disability in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, "terms, conditions, and privileges," in employment include "fringe benefits" made available to employees under a contractual arrange-

ment between an employer and an organization providing such benefits. *See* 42 U.S.C. § 12112(b); 29 C.F.R. § 1630.4 ("fringe benefits available by virtue of employment, whether or not administered by the [employer]"). Pursuant to this language, the EEOC has advocated in favor of the application of ADA Title I protection to employer-provided disability benefits. *See EEOC v. CNA Ins. Cos.*, 96 F.3d 1039, 1043 (7th Cir.1996). Other courts have likewise determined that benefits offered post employment such as pension and disability benefits are "fringe benefits" under the ADA and thus, an employer may not discrimination based on disability in regard to disability benefits under Title I. *See Ford v. Schering–Plough Corp.*, 145 F.3d 601, 604–05 (3d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999); *Castellano v. The City of New York*, 142 F.3d 58, 67 (2d Cir.1998); *Lewis v. Aetna Life Ins. Co.*, 982 F.Supp. 1158, 1160–61 (E.D.Va.1997). Accordingly, this Court finds that disability benefits provided to employees qualify as both a privilege of employment and a fringe benefit available by virtue of employment within the meaning of 42 U.S.C. § 12112(a). Hence, Title I of the ADA prevents discrimination based on disability in the provision of disability benefits.

Having determined that Title I of the ADA proscribes discrimination in disability benefits, the Court must still resolve the threshold issue of whether Mr. Conners is eligible to sue under Title I of the ADA. Although Defendants present their argument relating to this issue as a challenge to Mr. Conners' standing, the question of standing is not at issue in this case. Mr. Conners has been "injured in fact" by the denial of his benefits, which is "an injury to himself that is likely to be redressed by a favorable decision." *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In addition, Mr. Conners' injury is arguably in the zone of interests regulated by the ADA. *See id.* at 39 n. 19, 96 S.Ct. at 1925 n. 9. Rather, the challenge presented

by Defendants requires the Court to ascertain Mr. Conners' eligibility under the ADA's requirements to file suit. *See Ford*, 145 F.3d at 605.

■ Title I of the ADA provides protection against unlawful discrimination only to a "qualified individual with a disability." A "qualified individual with a disability" is defined by the statute as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). Accordingly, an individual eligible to sue under the ADA must be disabled, but still able to perform the essential functions of his or her position with or without a reasonable accommodation by the employer. There is no dispute in this case, however, that Mr. Conners is currently unable to work even with a reasonable accommodation. In fact, Mr. Conners, and any other LTD Plan disability benefit claimants, would not be qualified for disability benefits were he able to work with or without a reasonable accommodation.

Defendants contend that Mr. Conners is clearly ineligible to sue under Title I because, by virtue of the fact that he is currently totally disabled and unable to work even with a reasonable accommodation, he does not fit the criteria of a "qualified individual with a disability." They urge the Court to endorse the approach adopted by two federal courts of appeal in the context of challenges to alleged discrimination in the provision of fringe bene-

fits. *See Gonzales v. Garner Food Services, Inc.,* 89 F.3d 1523, 1526–28 (11th Cir.1996), *request for reh'g denied, Thomas v. Garner Food Services, Inc.,* 104 F.3d 373 (11th Cir.1996), *cert. denied, Wood v. Garner Food Services, Inc.,* 520 U.S. 1229, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *CNA Insurance Cos.,* 96 F.3d at 1042–45; see also *Parker v. Metropolitan Life Ins. Co.,* 99 F.3d 181, 185–87 (6th Cir.1996), *reh'g en banc granted, judgment vacated,* 107 F.3d 359 (6th Cir.1997), *reh'g en banc,* 121 F.3d 1006 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1178–84 (N.D.Tex. 1996). These courts determined that disabled ex-employees who can no longer work with or without reasonable accommodation to perform the essential functions of their former employment, are not "qualified individuals with a disability" under Title I of the ADA.

■ A court's proper first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute presented by the facts of the case. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). Having determined that, under the ADA, an employer may not discriminate in its provision of disability benefits, the Court finds that the particular facts of Mr. Conners' claim illuminate an internal inconsistency in the ADA between its definition of a "qualified individual with a disability" and the rights the statute confers. The disability benefits sought by Mr. Conners are meaningful only in the post-employment context: Mr. Conners is eligible for disability benefits under the LTD Plan only if he is unable to perform work functions. Yet, to be a "qualified individual with a disability" eligible to sue under the ADA, Mr. Conners must be able to perform the essential functions of his position with or without reasonable accommodation. Thus, Mr. Conners' claim reveals a potential disjunction between the ADA's definition of a "qualified individual with a disability" and the rights that the ADA confers. Title I prohibits discrimination by employers regarding the "terms, conditions, and privileges" in employment. 42 U.S.C. § 12112(a). However, if "terms, conditions, and privileges" include disability benefits, in order to effectuate the right against discrimination in disability benefits, Title I of the ADA must permit suits by individuals other than those who are currently able to work with or without reasonable accommodations. Without a broader reading of who qualifies as a "qualified individual with a disability," Title I contains an internal contradiction and does not protect the right to be free of discrimination in post-employment fringe benefits.

■ The contradiction between the explicit rights created by Title I of the ADA and the apparent eligibility standards for filing a suit under Title I requires the Court to view the eligibility requirements under Title I as ambiguous rather than as having "an unassailable plain meaning." *Ford,* 145 F.3d at 606. "The locus of the ambiguity is whether the ADA contains a temporal qualifier for the term 'qualified individual with a disability[.]' " *Id.* In order to interpret ambiguous language, the Court must first consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (citing *Robinson,* 519 U.S. at 340, 117 S.Ct. at 846 (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 2594–95, 120 L.Ed.2d 379 (1992))).

An examination of the legislative purpose of the "qualified individual with a disability" requirement reveals that Congress's purpose for requiring that disabled persons be capable of performing the essential functions of their jobs is not thwarted by permitting disabled persons no longer employed from suing their prior employer for discrimination in post-employment fringe benefits. In *Castellano v. City of New York,* 142 F.3d 58 (2d Cir.

1998), the Court of Appeals for the Second Circuit held that a retired employee, no longer able to perform the essential functions of his or her job, was a "qualified individual with a disability" for purposes of suing because of discrimination based on a disability in an employer's pension plan. That Court stated the purpose of the underlying inclusion of the essential functions requirement within the definition of "qualified individuals," as the following:

> Congress has stated its purpose to be "to ensure that employers can continue to require that all applicants and employees, including those with disabilities, are able to perform the essential, *i.e.*, the non-marginal functions of the job in question." H.R.Rep. No. 101–485(II), at 55 (1990), reprinted in 1990 U.S.C.C.A.N. 337; S.Rep. No. 101–116, reprinted in Arnold & Porter Legislative History P.L. 101–336, Americans with Disabilities Act of 1989, at 26 (1989). Congress used the phrase "qualified individual with a disability" to "reaffirm that [the ADA] does not undermine an employer's ability to choose and maintain qualified workers'," H.R.Rep. No. 101–485(II) at 55 (1990), reprinted in 1990 U.S.C.A.A.N. 337, and to allow employers to "select the most qualified applicant available" rather than be obliged to "prefer applicants with disabilities over other applicants on the basis of disability." H.R.Rep. No. 101–485(II), at 56 (1990), reprinted in 1990 U.S.C.C.A.N. 338; S.Rep. No. 101–116, reprinted in Arnold & Porter Legislative History P.L. 101–336, Americans with Disabilities Act of 1989, at 26–27 (1989). The definition "permits employers to select the most qualified applicant available rather than be obliged to prefer applicants with disabilities over other applicants on the basis of disability." H.R.Rep. No. 101–485(II), at 56 (1990), reprinted in 1990 U.S.C.C.A.N. 338; S.Rep. No. 101–116, reprinted in Arnold & Porter Legislative History P.L. 101–136, Americans with Disabilities Act of 1989, at 26–27 (1989)

*Castellano,* 142 F.3d at 67. It is clear that Congress was concerned with employers being forced to hire, fire, or retain unqualified, disabled employees. Where the alleged discrimination relates to the provision of post-employment fringe benefits, however, Congress's express concern is no longer implicated. Furthermore, individuals, such as Mr. Conners, who become disabled during their term of employment are entitled to participate in the LTD Plan when they are able to perform the essential functions of their position. Because Mr. Conners was qualified (*i.e.*, performed the essential functions of his job) while employed and on that basis became entitled to post-employment benefits, including disability benefits if eligible, the purpose of the essential functions requirement was served and is not circumvented if it is not required in the context of suing for discrimination in disability benefits.

"An interpretation that would prevent former employees who are no longer 'qualified individuals' from bringing claims of discrimination in tile provision of post-employment fringe benefits would also undermine the plain purpose of sections 12112(a) and (b)(2) of the ADA: to provide comprehensive protection from discrimination in the provision of fringe benefits." *Id.* at 68. Title I of the ADA seeks to prohibit disability discrimination in all aspects of the employment relationship. *See* 42 U.S.C. § 12101(a), (b)(1) ("It is the purpose of this chapter—to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."). To this end, the ADA specifically proscribes discrimination in fringe benefits of employment. As the Court of Appeals for the Second Circuit pointed out, a number of fringe benefits including pensions, health and life insurance, and disability benefits are post-employment benefits. Under Defendants' reasoning, an individual receiving post-employment fringe benefits would be unable to sue an employer discriminating against him or her in its provision of these benefits

based on disability. Such a reading would permit employers to discriminate freely against individuals who were qualified during their employment to receive disability benefits once the individuals became eligible for the benefits. "So enormous a gap in the protection afforded by Title I would be clearly at odds with the expressed purpose of the ADA to 'address the major areas of discrimination faced day-to-day by people with disabilities,' 42 U.S.C. § 12101(b), and 'to bring individuals with disabilities into the economic and social mainstream of American life . . . in a clear, balanced, and reasonable manner.'." *Lewis*, 982 F.Supp. at 1163 (citing H.R.Rep. No. 485, 101st Cong.Pt. 2 at 99 (1990)).

A recent decision tendered by the United States Supreme Court in *Robinson v. Shell Oil*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), interpreting the term "employee" in the antiretaliation provision of the ADA's sibling statute Title VII, lends support for interpreting Title I of the ADA to permit suits by disabled individuals against their former employers concerning disability benefits. *See Ford*, 145 F.3d at 606 ("Cases interpreting Title VII are relevant to our analysis of the ADA because the ADA is essentially a sibling statute of Title VII. Indeed the ADA's accompanying House Report states that the purpose of the ADA is 'to provide civil rights protections for persons with disabilities that are parallel to those available to minorities and women.' ") (citing H.R.Rep. No. 101–485, pt. 3, at 48 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 471). In *Robinson*, an employer provided a negative reference allegedly in retaliation for the former employee's filing of an EEOC charge against it. *See* 519 U.S. at 338–40, 117 S.Ct. at 845–46. The plaintiff former employee sued under section 704(a) of Title VII and the Supreme Court analyzed whether former employees are allowed to bring suits against their previous employers under Title VII for post-termination retaliation.

Section 704(a) of Title VII, prohibits an employer from discriminating against any of its employees or applicants for employment. *See* 42 U.S.C. § 2000e–3(a). In *Robinson*, the Supreme Court found that the undefined term "employees," as used in section 704(a), was ambiguous as to whether it excludes former employees or encompasses former employees. *See id.* at 846–48. Resolving the ambiguity, the Supreme Court held that the term employees as used in section 704(a) of Title VII, protects former employees as well as current employees even though "former employees" are nowhere mentioned in the text. *Id.* at 347, 117 S.Ct. at 849. The Supreme Court approved the argument presented by the EEOC that a narrow reading of the term "employees" to exclude suits by former employees for retaliatory acts after employment,

> "would vitiate much of the protection afforded by section 704(a) . . . [and] would undermine the effectiveness of Title VII by allowing the threat of post-employment retaliation to deter victims of discrimination from complaining to the EEOC, and would provide a perverse incentive for employers to fire employees who might bring Title VII claims."

*Id.* at 344, 117 S.Ct. at 848. The reasoning of the Supreme Court in *Robinson* applies with equal force to the instant case. As discussed, limiting the temporal reach of "qualified individuals with a disability" to exclude former employees would undermine the purpose of preventing disability discrimination in the provision of fringe benefits and vitiate the right of individuals to be free from such discrimination.

The foregoing discussion demonstrates that Defendants' position is illogical. Were the Court to adopt the Defendants' definition of a "qualified individual with a disability," a disabled person in need of disability benefits because he or she is currently unable to work would be unable to sue his or her prior employer for discrimination in regard to these benefits un-

der Title I of the ADA. Such a construction of the statute would result in the situation that just when an employee becomes eligible for disability benefits offered by his or her employer, he or she is at the same moment ineligible to assert his or her right to receive those benefits free of discrimination based on his or her disability. Disability benefits would be effectively immune from the proscriptions against discrimination in employment benefits under the ADA. As the Court of Appeals for the Third Circuit explained in *Ford v. Schering–Plough Co.*, "[o]nce an individual becomes disabled and thus eligible for disability benefits, that individual loses the ability to sue under a strict reading of Title I's definition of 'qualified individual with a disability' because that individual can no longer work with or without a reasonable accommodation." 145 F.3d at 606. Therefore, the narrow reading of "qualified individual with a disability" proposed by Defendants would permit employers to discriminate in regard to fringe benefits that are provided in the post-employment context and effectively render ADA's protections void.

The Court determines that the decisions by the Seventh and Eleventh Circuits in *CNA* and *Gonzales* are not persuasive. In each case, plaintiff-employees obtained insurance plans through their employers that provided benefits that could be accessed after employment. *See CNA*, 96 F.3d at 1041 (disability benefits policy); *Gonzales*, 89 F.3d at 1524 (health insurance policy). In *CNA*, the Court of Appeals for the Seventh Circuit rejected the very same argument presented in this case by noting that "nothing happened that discriminated against [plaintiff] during the time she was working at the CNA. The only thing that occurred was CNA's 1985 decision to reduce the long-term benefits available to all of its employees for mental health problems." 96 F.3d at 1045. The Seventh Circuit Court of Appeals conflated two issues, the first being whether the individual could sue regarding fringe benefits while completely disabled, and the second being whether the individual's suit had merit and was based upon actual discrimination. Ultimately, the court declined to find the individual eligible to sue because her suit lacked merit.

In *Gonzales*, the Court of Appeals for the Eleventh Circuit held that the meaning of a "qualified individual with a disability" unambiguously did not include disabled employees unable to perform the essential functions of their jobs. 89 F.3d at 1530–31. However, the court concentrated on what it believed to be the plain meaning of the ADA without addressing the possibility that the disparity between the rights created by the ADA and the apparent legal remedy fashioned by the ADA creates an ambiguity in the eligibility requirements for obtaining a remedy. *See id.* at 1526–29. Because the Court finds that an ambiguity is exposed by a disabled claimant asserting his or her rights against discrimination in fringe benefits, the Court disagrees with the analysis presented by the Court of Appeals for the Eleventh Circuit. In addition, the Court notes that these decisions were handed down before the Supreme Court issued its decision in *Robinson*.

The Court of Appeals for the First Circuit has not resolved nor addressed whether there exists an ambiguity between the requirements for suit under the ADA and the rights the statute confers. In *August v. Offices Unlimited, Inc.*, 981 F.2d 576 (1st Cir.1992), however, the Court of Appeals for the First Circuit examined whether an employee who was unable to work because of severe depression was not a "qualified handicapped person" within the meaning of the Massachusetts handicapped discrimination statute, M.G.L.A. c. 151B § 4(16). The Massachusetts statute contains language similar to the ADA and states that it is an unlawful practice "for an employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against,

because of his handicap, any person alleging to be a qualified handicapped person...." Mass.Gen.L. ch. 151B § 4(16). A "qualified handicapped person" under the statute is a person "who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Mass.Gen.L. ch. 151B § 1(16). The court found that the plaintiff was incapable of performing the essential functions of his position with or without reasonable accommodation to his handicap. *See August,* 981 F.2d at 580–82.

Relying on the United States Court of Appeals for the Eighth Circuit's decision in *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768 (8th Cir.1987), interpreting the "otherwise qualified handicapped individual" requirement as rendering totally disabled employees ineligible to sue under the federal Rehabilitation Act, the court concluded that, because the plaintiff was totally disabled at all relevant times including the day of the alleged discrimination, the plaintiff could not establish that he was a "qualified handicapped person" under the Massachusetts statute. *See August,* 981 F.2d at 584.

Although the decision in *August* provides potential support for a decision by the Court of Appeals for the First Circuit disagreeing with the Court's conclusion here—that disabled individuals who are no longer able to perform the essential functions of employment are eligible to sue under the ADA—the Court is not dissuaded from its position. The decision tendered by the Court of Appeals in *August* was issued in 1992, before the Supreme Court's decision in *Robinson.* Furthermore, the *August* decision involved the interpretation of a Massachusetts state anti-discrimination statute rather than the ADA itself. In addition, the court considered only the plain language of the Massachusetts statute and did not discuss its legislative purpose. *See id.* at 580. Thus, that court did not consider whether an ambiguity was created regarding entitlement to sue under the statute by the facts presented in the case in light of the broad purpose of the statute in preventing discrimination in fringe benefits. Accordingly, the Court finds that, although relevant, the decision by the Court of Appeals for the First Circuit in *August* is not controlling here.

To conclude, the factual predicate of Mr. Conners' claim under Title I of the ADA illuminates an internal inconsistency in the statute regarding a plaintiff's eligibility to sue for discrimination in disability benefits. With all due respect, this Court declines to follow the Seventh and Eleventh Circuits and concurs with the decisions tendered by the Second and Third Circuits. The Court finds that the term "qualified individual with a disability" should be interpreted to include individuals formerly employed and currently completely disabled so as to be eligible for the disability benefits offered by his or her former employer. Thus, former employees currently totally disabled are "qualified individuals with a disability" and may sue under the ADA for discrimination in disability benefits that they receive post-employment. Accordingly, Mr. Conners is eligible to sue under Title I of the ADA.

### 2. Title III Claim: The UNUM Plan as a Good or Service Provided by Place of Public Accommodation.

■ Defendants also contend that Mr. Conners cannot maintain a claim under Title III of the ADA against MMC and UNUM because Title III does not apply to benefits or services that an individual receives from his or her employer by virtue of his or her employment. As mentioned, prohibited discrimination under Title III includes the denial, on the basis of disability, of the opportunity to benefit from the goods, services, privileges, advantages, or accommodations of an entity. *See* 42 U.S.C. § 12182(b); 28 C.F.R. § 36.202. Thus, Title III specifically prohibits tile provision of unequal or separate benefits

by a place of public accommodation. Citing law from other circuits, Defendants ask the Court to interpret the term "public accommodation" as being limited to actual physical structures with defined physical boundaries that a person physically enters for the purpose of utilizing the facilities or obtaining services therein. Furthermore, they contend that Title III narrowly proscribes·the denial of equal physical access to persons on the basis of their disability and does not apply to the substance of the goods or services provided by the public accommodations. Applying this definition, Defendants contend that UNUM and MMC are not public accommodations under Title III because Mr. Conners did not walk into their physical structures and purchase the LTD Plan.

Defendants rely primarily on decisions published by the Courts of Appeal for the Third and Sixth Circuits' in *Ford* and *Parker*, wherein the courts held that, although an insurance office is a public accommodation as expressly set forth in section 12181(7) of the ADA, where a plaintiff has accessed a benefit plan provided by her private employer and issued by an insurance company, the benefit plan is not a good offered by a place of public accommodation. *Ford*, 145 F.3d at 612–14; *Parker*, 121 F.3d at 1010–15; *see also Erwin v. Northwestern Mutual Life*, 999 F.Supp. 1227, 1230–34 (S.D.Ind.1998).[1] However, in regard to this issue the Court can rely on controlling law from the Court of Appeals for the First Circuit with which the courts in *Ford* and *Parker* clearly disagree. *See Ford*, 145 F.3d at 613–14;

*Parker*, 121 F.3d at 1012–13. In *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Assoc. of New England, Inc.*, 37 F.3d 12 (1st Cir.1994), the First Circuit Court of Appeals held that a defendant who provides medical benefit plans could be considered a public accommodation under Title III. *Id.* at 19–20. The question of whether Title III intended only to protect access to services, or whether Congress meant, in addition, to proscribe discriminatory products and services offered by public accommodations, was left undecided in *Carparts*. Nothing in the legislative history precludes extending the statute to the substance of the good or service. *Id.* at 20. This Court agrees, as another district court from this circuit has, that under the plain language of Title III, the Act would extend to the substance or contents of an insurance policy. *See Doukas v. Metropolitan Life Ins. Co.*, 950 F.Supp. 422, 425–27 (D.N.H.1996) (Devine, D.J.). UNUM is a public accommodation, and its insurance policies are a good or service under Title III. Because the court of appeals for this circuit has held that Title III applies to discrimination in employee benefit plans and this Court finds that Title III's proscription applies to the substance of, rather than merely the access to, employee benefit plans, Mr. Conners may pursue a claim under Title III of the ADA.

### 3. Statute of Limitations: The Timeliness of Plaintiff's ADA Claims.

The ADA applies the limitations period and exhaustion requirements set forth un-

1. Defendants also rely on the statement made by the United States District Court of Massachusetts in *Motzkin v. Trustees of Boston Univ.*, 938 F.Supp. 983, 996 (D.Mass.1996) (Karol, M.J.), stating that "the legislative intent is so clear from the language of Titles I and III that one need not go beyond that language to conclude that employment discrimination is the exclusive province of Title I" as support for their argument. However, that case is distinguishable from the case at bar. In that case, a plaintiff attempted to bring a discrimination claim under Title III of the ADA against his employer for early termi-
nation allegedly based on his disability. *See id.* at 985–87. The court held that a job is not a privilege, advantage, good, or service offered to members of the public by places of public accommodation, *see id.* at 996, and, thus, Title III does not apply to employment discrimination. However, in the case at bar, Mr. Conners alleges that UNUM and MMC discriminated against him in their provision of disability benefits that distinguish between physical and mental benefits. Disability benefits are more akin to a privilege, advantage, good, or service than to one's employment. Thus, Title III arguably applies here.

der Title VII of the Civil Rights Act of 1964 to claims brought under Title I. *See* 42 U.S.C. § 12117(a) (adopting for Title I of the ADA enforcement procedures available under Title VII of the Civil Rights Act of 1964). However, the ADA does not specify a statute of limitations for claims filed under Title III. Therefore, the issue of whether the claims under Title I and Title III are timely must be considered separately by the Court.

### a. Title I.

There are several requirements that a plaintiff must meet prior to filing a federal civil rights action under Title I of the ADA in federal court. A plaintiff alleging a violation of Title I in Maine must file a charge of discrimination with the EEOC within 300 days of the accrual of his cause of action. *See* 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a).[2] "The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980). Mr. Conners filed his administrative charge of discrimination challenging the application of the two-year limit on his disability benefits under the LTD Plan on October 24, 1997. Plaintiff's Statement of Facts Not In Dispute, Exhibit 5 at 2.

The 300–day administrative filing requirement for a plaintiff's ADA claim begins to run only after a plaintiff's claim has accrued. Here, we have a directive from Congress that time limitations in civil rights actions commence with the date of the "alleged unlawful employment practice." *See* 42 U.S.C. § 2000e–5(e)(1). Determining the timeliness of Mr. Conners'

administrative charge requires the Court to first identify precisely the unlawful discrimination of which he complains. In his motion for summary judgment, Mr. Conners argues that discrimination not only motivated UNUM and MMC from limiting his disability benefits, but also in terminating his employment on April 26, 1996, which resulted in MMC no longer contributing to Mr. Conners' pension. Plaintiff's Cross–Motion for Summary Judgment on Liability and Incorporated Memorandum with Arguments Opposing Defendants' Motion for Summary Judgment (Docket No. 24) at 10–11. In effect, he argues that the day of the alleged unlawful employment action and, thus, the day that the 300–day statute of limitations commences, was the day that he was notified of the termination of his employment, April 25, 1997, and, hence, his charge was timely.[3] *Id.; see* Plaintiff's Reply Memorandum to Defendants' Join Objection to Cross Motion for Summary Judgment, Exhibit C. This argument cannot be squared with the allegations of Mr. Conners' Amended Complaint, which clearly allege that the Defendants discriminated when they applied a limitation on Mr. Conners' disability benefits because his disability was caused by a mental, rather than a physical, disorder. Amended Complaint ¶¶ 20, 24.

In this case, Mr. Conners challenges the LTD Plan's differentiation between mental and physical disabilities, not MMC's decision to terminate his employment or to stop contributing to his pension plan. The decision to limit Mr. Conners' benefits is the decision that is relevant to Mr. Conners' cause of action. The fact that his employment was terminated pursuant to a company policy that a person who no longer receives disability benefits is no longer an employee is an inevitable, albeit de-

---

2. Because Maine has an agency with the authority to address charges of discriminatory employment practices, the applicable period for filing a charge of discrimination is 300, rather than 180, days. *See* 42 U.S.C. § 2000e–5(e)(1).

3. It is undisputed that Maine Medical Center informed Mr. Conners in April of 1997 that they had terminated his employment as of April 26, 1996.

layed, consequence of the original determination that the two-year limit applied to Mr. Conners. *See Ricks,* 449 U.S. at 257–58, 101 S.Ct. at 503–04. In regard to his ADA claims, Mr. Conners alleges in his Amended Complaint, the following:

> The Defendants further discriminated against Mr. Conners and other similarly situated individuals with what are termed "mental" or "nervous" disabilities by terminating their long-term disability benefits after 24 months precisely because of that characterization of their disabilities while allowing individuals with so-called "physical disabilities" to receive long-term disability benefits to age 65. In addition, at the time UNUM's (*sic* ) ceased making long-term disability insurance payments to Joseph Conners, Maine Medical Center also ceased contributing to his vested pension benefits plan by characterizing his disability as mental rather than physical thereby discriminating against him in violation of the ADA.

Amended Complaint, ¶ 20. It is clear from the Amended Complaint, that Mr. Conners ultimately complains of UNUM and MMC's decision to classify his disability as mental and limit his benefits according to an allegedly discriminatory disability benefits plan. A thorough reading of the record demonstrates that the subsequent termination of Mr. Conners' employment and MMC's contributions to his pension occurred pursuant to the company policy that once disability benefits are terminated, employment is terminated. Mr. Conners does not allege that the company policy according to which these later decisions were made is itself discriminatory. Hence, Mr. Conners has not alleged any additional discriminatory acts in addition to the original decision to cap Mr. Conners' disability benefits.

The Supreme Court and the Court of Appeals for the First Circuit have held that the date of the original allegedly discriminatory decision, not the date upon which subsequent consequences of the original determination occurred, is the allegedly unlawful decision from which the statute of limitations runs. "The emphasis is not upon the effects of earlier ... decisions; rather it is ·[upon] whether any present violation exists." *Id.* at 258, 101 S.Ct. at 504. In *Ricks,* a denial of tenure case, the Supreme Court held that "the only alleged discrimination occurred—and the filing limitations period therefore commenced—at the time the tenure decision was made and communicated to Ricks." 449 U.S. at 258, 101 S.Ct. at 504. Likewise, in *Chardon v. Fernandez,* a 42 U.S.C. § 1983 case involving the termination of employment of public employees, the Court similarly stated that "the operative decision was made—and notice given—in advance of a designated date on which employment terminated." 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). The key question in both cases was whether the relevant date for purposes of the statute of limitations is when "the consequences became painful," *Chardon,* 454 U.S. at 8, 102 S.Ct. at 29, or is the date the decision was made and the employee was notified. The Supreme Court and the Court of Appeals for the First Circuit in subsequent decisions determined that the time the original allegedly discriminatory decision was made is relevant for statute of limitations purposes. *See American Airlines, Inc. v. Cardoza–Rodriguez,* 133 F.3d 111, 123 (1st Cir.1998) (holding that statute of limitations for Title VII claim began to run when employees elected to retire early rather than when employment terminated); *Morris v. Gov't Dev. Bank of Puerto Rico,* 27 F.3d 746, 749 (1st Cir.1994) (holding that "the point at which the consequences of the act become hardest to bear—which may or may not coincide with the occurrence of the act itself—has no relevance for purposes of framing the limitations period."); *Kassaye v. Bryant College,* 999 F.2d 603, 606 (1st Cir.1993) (holding that "the mere effects or consequences of past discrimination, as opposed to independently actionable violations of Title VII, are insufficient to serve as the trigger

of the limitations period."). Here, the Amended Complaint and the record demonstrate that the only allegedly unlawful action taken by MMC and UNUM was the original decision to apply a two-year limitation to Mr. Conners' disability benefits because he suffered from a mental, rather than a physical, disability. Although this decision set into motion a chain of events making this original determination harder to bear, the subsequent termination of employment and pension contributions were mere effects of the earlier decision and are of no consequence to the statute of limitations inquiry. Thus, the unlawful discrimination of which Mr. Conners' complains is the decision to limit his disability benefits to two years because he suffers from a mental disability.

■ The next task is to ascertain the date upon which Mr. Conners' claim that the LTD Plan is discriminatory accrued. Defendants contend that Mr. Conner's claim accrued when he first enrolled in a disability benefit plan that allegedly discriminates against him under the ADA. The Defendants reason that once a claimant is enrolled in a purportedly discriminatory plan, the claimant's cause of action has accrued whether or not the claimant is eligible for the benefits on that date. According to Defendants' logic, because the LTD Plan was adopted *before* the ADA was enacted into law and went into effect, Mr. Conner's claim accrued on the date the ADA went into effect, July 26, 1992, because on that date Mr. Conners was enrolled in a disability benefit plan that allegedly discriminated against him under existing law. Defendants' argument is not on target. Although Mr. Conners may have been a victim of discrimination when he received the LTD Plan and the ADA had been enacted into law proscribing discrimination against individuals based on a disability, Mr. Conners' discrimination claim was not ripe for adjudication on that date and, therefore, did not accrue on that date.

■ Defendants alternatively contend that the date of the allegedly discriminatory practice was on June 27, 1994, when Mr. Conners was made aware that an allegedly discriminatory action had been taken against him. In its letter of June 27, 1994, not before, UNUM explicitly made it clear that it had classified Mr. Conners' disability as "mental" and, therefore, had designated him as subject to the two-year limitation on his benefits. *See* Fohlin Affidavit, Attachment B at 31–32. Before that time, Mr. Conners' status under the LTD Plan was unclear, and a claim for wrongful denial of such benefits would not have been ripe.[4] For example, UNUM's letter to Mr. Conners informing him that he was eligible for disability benefits, mailed to Mr. Conners on May 5, 1994, did not clarify that his disability had been classified as mental. *Id.* at 22–23.

---

4. Defendants cite this Court's decision in *Bolduc v. National Semiconductor Corp.*, 35 F.Supp.2d 106 (D.Me.), as support for their contention that the accrual date of this claim was the date on which Mr. Conners was enrolled in a plan that is purportedly discriminatory under the ADA. *Bolduc* does not lend Defendants support for their position. In *Bolduc*, as in this case, the Court found that the statute of limitations commenced on the day that Mr. Bolduc had clear and unequivocal notice that his claim for benefits had been clearly repudiated by his employer. *See id.* at 119–20. The employer had clearly repudiated Mr. Bolduc's claim for benefits when it hired Mr. Bolduc and told him that he was not eligible for employment benefits because he was hired as an independent contractor. *See*

*id.* at 118–20. At that point, Mr. Bolduc was eligible to receive the employment benefits that he sought, but for the employer's determination regarding his status. Mr. Bolduc's claim was ripe for adjudication at the time he was told he would not receive benefits by virtue of his independent contractor status because his injury was capable of being redressed by a favorable decision of this Court. Here, Mr. Conners was enrolled in the LTD Plan but was not explicitly given notice that he would not receive full-term benefits until the letter of June 27, 1994. Before this notification, Mr. Conners was unaware of how his disability, if he became disabled, would be characterized and whether he would receive full-term benefits.

Neither that letter, nor other letters Mr. Conners received concerning his disability benefits prior to the letter of June 27, 1994, indicated that Mr. Conners' disability had been classified as mental under the LTD Plan. Therefore, the Court agrees with Defendants that the second date they propose, June 27, 1994, when Defendants notified Mr. Conners that his disability had been classified as mental and explained that the two-year limitation applied to him, is the date upon which the alleged discriminatory action occurred.

Mr. Conners argues that June 27, 1994, is not the date upon which his claim accrued because his benefits were not definitely and finally denied until he had·exhausted his grievance procedures with the company. Mr. Conners suggests that his claim accrued when he had thoroughly exhausted the appeals process regarding his disability benefits which, according to the record, ended on June 5, 1997, when MMC finally denied Mr. Conner's appeals. Plaintiff's Statement of Material Facts Not in Dispute, Exhibit 11.[5] It is true that Mr. Conners consistently appealed MMC and UNUM's decision after January of 1996. Despite Mr. Conners' diligent attempt to challenge the denial of his benefits and to

pursue his rights under the LTD Plan, the fact remains that it was clearly and unequivocally obvious that Mr. Conners would be subjected to inferior coverage on the basis of his disability on June 27, 1994.[6] The Supreme Court has held that "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period." *Ricks*, 449 U.S. at 261, 101 S.Ct. at 506 (citing *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976)). Despite the existence of a grievance procedure, Mr. Conners' pursuit of those remedies, and UNUM and MMC's assurances that Mr. Conners' appeals would be seriously considered, the rule remains that limitations periods normally commence when the allegedly unlawful employment practice giving rise to the cause of action that is the subject of the complaint occurs. In this case, that date is June 27, 1994, when Defendants clearly communicated to Mr. Conners that they had designated his disability as mental and subjected him to the two-year limitation on mental disabilities.

Therefore, the 300–day limitations peri-

---

**5.** Mr. Conners suggests that the final date of the appellate process was in December of 1997, when Maine Medical Center denied, for the final time, his request for benefits under the Maine Medical Center Pension Plan that had been terminated as a result of the termination of his employment. As discussed, the termination of Mr. Conners' employment and pension contributions are merely consequences of the original allegedly unlawful act of designating Mr. Conner's disability as mental and not the discrimination which gives rise to the cause of action. Thus, the date that the grievance procedures for the decision regarding Mr. Conners' employment and pension were exhausted is not the relevant date to this cause of action. Instead, the date June 5, 1997, on which the grievance procedures to protest Defendants' decision regarding his disability benefits were complete, is relevant to Mr. Conners' argument.

**6.** The Court is sympathetic to Mr. Conners' position. It is true that the Court's decision could encourage a deluge of hypothetical

claims which may never ripen into actual controversies or injuries. Mr. Conners may have resolved his complaint with UNUM and MMC before the two years ran out and never have experienced the loss of disability benefits. It is also not unreasonable for an individual who is subjected to an adverse decision regarding his or her benefits to believe this is not a final determination until the appellate process regarding that decision is complete. However, this concern was articulated by Justice Brennan in his dissent in *Chardon*, when he stated that:

> The effect of this ruling will be to increase the number of unripe and anticipatory lawsuits in the federal courts—lawsuits that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy.

*Chardon*, 454 U.S. at 9, 102 S.Ct. at 30 (J. Brennan, dissenting). A majority of the Court chose to reject this argument, and this Court is bound to the analysis of the majority.

od commenced to run on June 27, 1994.[7] Because Mr. Conners filed his administrative charge on October 24, 1997—more than three years after this date, his administrative charge was not timely. Mr. Conners has not argued that there was interference or involvement of the Defendants in causing any filing delay, and nothing in the record points to any such circumstances. No other basis exists in the record for invoking equitable tolling principles. Accordingly, Mr. Conners' claim under Title I is barred because he failed to file a timely administrative charge. Summary judgment will be entered for Defendants on Count I.

### b. Title III.

■ The ADA does not contain an express statute of limitations for Title III claims. Where a federal statute does not contain an express limitations period, federal courts must adopt the most analogous state statute of limitations. *See Wilson v. Garcia,* 471 U.S. 261, 266, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). No court has determined the appropriate limitations period under Maine law to apply to Title III ADA claims. To accomplish this task, the court "must characterize the essence of the claim in the pending case, and decide which state statute provides the most appropriate limiting principle." *Id.* at 268, 105 S.Ct. at 1942–43. The Court finds that a claim for discrimination brought under the ADA is best characterized as a claim for personal injury. Maine has a six-year statute of limitations for all civil actions, 14 M.R.S.A. § 752. Defendants urge the Court to adopt the two-year statute of limitations that applies to all claims brought under the MHRA for ADA claims. 5 M.R.S.A. § 4613(2)(C). The MHRA proscribes discrimination based on a physical or mental disability in public accommodations and is, therefore, analogous to the ADA. *See* 5 M.R.S.A. § 4591. However, the Supreme Court, in the interest of uniformity within a state as to time periods for filing civil rights actions, has advised that courts should characterize civil rights claims generally, rather than predicate a choice of the correct statute of limitations on an analysis of the particular facts of each claim. *See Wilson,* 471 U.S. at 272–76, 105 S.Ct. at 1945–47. Accordingly, the Court finds that the six-year statute of limitations that applies to all civil actions applies to Mr. Conners' ADA claim rather than the more specific two-year limitation period contained in the MHRA. *See McKay v. Winthrop Bd. of Educ.,* 1997 WL 816505 (D.Me.) (applying Maine six-year statute of limitations for civil actions to ADA claim).

■ Having determined that Maine's six-year statute of limitations for civil actions applies to Mr. Conners' ADA claim, the Court must next determine the date upon which his claim under Title III of the ADA accrued. In a federal question case, and in the absence of a contrary directive from Congress, "the discovery rule," applies to determine the date that a claim accrued. According to the so-called "discovery rule," a plaintiff's cause of action accrues when he or she discovers, or with due diligence should have discovered the injury that is the basis of the litigation. *See Bolduc v. National Semiconductor Corp.,* 35 F.Supp.2d 106, 118–19 (D.Me.) Consistent with the discovery rule, the Court finds that a claim made under the ADA accrues when a plaintiff receives final and definite notice of the allegedly discriminatory decision. The Court ascertains that the allegedly unlawful employment practice against Mr. Conners occurred on June 27, 1994, for purposes of his Title I claim. On that date, Mr. Conners received clear and definite notice that UNUM had

---

7. The Court need not consider whether the date provided by the Maine Human Rights Commission as the date the alleged unlawful discrimination occurred—April 26, 1996—is the correct date for purposes of the 300–day statute of limitations. Mr. Conners filed his administrative charge with the MHRC in October of 1997, more than 300 days after April 26, 1996.

made a decision against him that is alleged to be unlawful. Thus, in accordance with the discovery rule, Mr. Conners' claim accrued for purposes of his Title III claim on June 27, 1994.

Mr. Conners filed his suit on July 20, 1998—approximately four years after the date his claim accrued. Consequently, Mr. Conners' claim under Title III of the ADA is timely because it was filed within the applicable statutory period under state law. Accordingly, Mr. Conners' claim under Title III of the ADA is timely and, thus, summary judgment will not be granted for Defendants on Count II.

*4. Physical/Mental Distinctions in Employee Benefit Plans as Discrimination in Violation of the ADA.*

Although Mr. Conners' claim under Title III of the ADA is timely, it must be dismissed because Mr. Conners may not maintain claims under either Title I or Title III because he has not stated a cognizable claim for discrimination under the ADA. In essence, Mr. Conners claims that the LTD Plan discriminates against him by arbitrarily providing different levels of benefits for psychological disabilities than are provided for physical disabilities. The Court concludes that Mr. Conners argument does not support a finding of discrimination under the ADA.

A disability benefit plan like the one at issue in this case is common in today's workplace. However, the question of whether such a plan is discriminatory under the ADA is not a settled point of law. United States Circuit Courts of Appeal for the Third, Sixth, and Seventh Circuits have addressed this precise question and found that such disparity does not constitute discrimination under the ADA. *See Ford v. Schering-Plough Corp.,* 145 F.3d 601; *Parker,* 121 F.3d 1006; *CNA Ins. Co.,*

96 F.3d 1039; *see also Krauel v. Iowa Methodist Medical Center,* 95 F.3d 674, 679–80 (8th Cir.1996) (holding that a health plan that excluded treatment of infertility from its disability benefits was not discriminatory under the ADA); *Rogers v. Dep't of Health and Environmental Control,* 985 F.Supp. 635 (D.S.C.1997); *EEOC v. The Chase Manhattan Bank,* 1998 WL 851605 (S.D.N.Y.) (unpublished disposition).[8] A District Court issued a contrary opinion on the issue and determined that such a distinction is unlawful discrimination under the ADA. *See Lewis,* 982 F.Supp. 1158. The Court of Appeals for the First Circuit has not addressed the issue, nor has a district court from this circuit.

The courts that have squarely confronted this issue rely on cases from the Supreme Court and Circuit Courts of Appeals concerning the Rehabilitation Act. In the Supreme Court case, *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), relied on by the Courts of Appeal for the Third and Sixth Circuits in *Ford* and *Parker,* the Supreme Court rejected the argument that a statute that precluded the Veterans Administration from granting extensions to a ten-year delimiting period for veterans to claim their benefits if the veterans' disabilities arose from their own willful misconduct, defined by the relevant regulations as including alcoholism, discriminated against one type of disability. The Supreme Court reasoned that "[t]his litigation does not involve a program or activity that is alleged to treat handicapped persons less favorably than nonhandicapped persons." *Id.* at 548, 108 S.Ct. at 1382. The Court explicitly declared that "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped per-

---

**8.** Courts interpreting the ADA's predecessor, the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994), have issued opinions finding that providing a lower level of benefits for psychological disabilities than for physical disabilities does not constitute unlawful discrimination. *See Modderno v. King,* 82 F.3d 1059 (D.C.Cir.1996); *Doe v. Colautti,* 592 F.2d 704 (3rd Cir.1979).

sons." *Id.* at 549, 108 S.Ct. at 1382. Thus, according to the Supreme Court's decision in *Traynor*, differentiating between different disabilities in the provision of benefits is distinguishable from differentiating between the disabled and the nondisabled. According to the Courts of Appeal for the Third and Sixth Circuits, the holding in *Traynor*, that a covered entity is free to differentiate between different disabilities under the Rehabilitation Act, should be extended to the ADA. *See Ford,* 145 F.3d at 608–609; *Parker,* 121 F.3d at 1016.

In accordance with the rule from *Traynor*, the Court of Appeals for the Seventh Circuit rejected the plaintiff's challenge to the disparity between benefits for mental and physical illnesses, and stated,

> One of those terms, conditions or privileges of employment [under the ADA] may be a pension plan, but there is no claim here that CNA discriminated on the basis of disability in offering its pension plan to anyone. It did not charge higher prices to disabled people, on the theory that they might require more in benefits. [citations omitted.] Nor did it vary the terms of its plan depending on whether or not the employee was disabled. All employees—the perfectly healthy, the physically disabled, and the mentally disabled—had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous. [citations omitted.] [The plaintiff] raises a different kind of discrimination claim, more grist for the ERISA mill or the national health care debate than for the ADA. She claims that the plan discriminates against employees who in the future will become disabled due to mental conditions rather than physical conditions; their present dollars (unbeknownst to them) are buying only 24 months of benefits, instead of benefits lasting much longer. However this is dressed up, it is really a claim that benefits plans themselves may not treat mental health conditions less favorably than they treat physical health conditions. Without far stronger language in the ADA supporting this result, we are loath to read into it a rule that has been the subject of vigorous, sometimes contentious, national debate for the last several years. Few, if any, mental health advocates have thought that the result they would like to see has been there all along in the ADA.

*CNA,* 96 F.3d at 1044. Furthermore, in denying the plaintiff's claim in *Ford,* the Court of Appeals for the Third Circuit explained that,

> [w]hile the defendants' insurance plan differentiated between types of disabilities, this is a far cry from a specific disabled employee facing differential treatment due to her disability. Every ... employee had the opportunity to join the same plan with the same schedule of coverage, meaning that every ... employee received equal treatment. So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities. The ADA does not require equal coverage for every type of disability; such a requirement, if it existed would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA.

*Ford,* 145 F.3d at 608. According to the foregoing reasoning, a benefits plan that distinguishes between disabilities is conceptually different from a benefits plan that distinguishes between the disabled and the nondisabled. The ADA forbids a covered entity from denying an individual or class of individuals benefits that are offered to all individuals because the individual or individuals are disabled. However, if all individuals are denied the same benefits and no differential treatment be-

tween the disabled and nondisabled occurs in the initial provision of benefits, no discrimination under the ADA has taken place.

As the Court of Appeals for the Third Circuit points out, reading the ADA so that it does not prohibit differentiating between benefits is in accord with the statute's legislative history. The *Ford* Court points to the report from the Senate Labor and Human Resources Committee, which states:

> In addition, employers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability. For example, while it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments, *e.g.,* only a specified amount per year for mental health coverage, a person who has a mental health condition may not be denied coverage for other conditions such as for a broken leg or for heart surgery because of the existence of the mental health condition. A limitation may be placed on reimbursements for a procedure or the types of drugs or procedures covered[,] *e.g.,* a limit on the number of x-rays or non-coverage of experimental drugs or procedures; but, that limitation must apply to persons with or without disabilities. All people with disabilities must have equal access to the health insurance coverage that is provided by the employer to all employees.

*Ford,* 145 F.3d at 610 (citing S.Rep. No. 101–116, at 29 (1989)).

Subsequent legislative occurrences to the ADA's passage illustrate that Congress did not believe that the ADA mandated parity between mental and physical disability benefits. In 1996, an amendment to the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104–191, 110 Stat.1936 (1996), that would have mandated parity between insurance coverage for mental and physical illnesses was proposed and defeated. The *Ford*

and *CNA* Courts reasoned that "such an amendment would have been unnecessary altogether if the ADA already required such parity." *See Ford,* 145 F.3d at 610; *CNA,* 96 F.3d at 1044. Furthermore, after the ADA, Congress passed the Mental Health Parity Act of 1996, Pub.L. No. 104–204, Title VII, 110 Stat. 2944 (1996) (codified at 29 U.S.C. § 1185a and 42 U.S.C. § 300gg–5), which mandates that a health insurance plan containing no annual or lifetime limit for medical benefits cannot have such limits on mental health benefits. The *Ford* Court reasoned that "[s]uch congressional action reveals both that the ADA does not contain parity requirements and that no parity requirements for mental and physical disability benefits have been enacted subsequent to the ADA." *Ford,* 145 F.3d at 610. Thus, the legislative history of the ADA and the history and substance of subsequent legislation reveals that Congress did not intend for the ADA to require parity in mental and physical disability benefits.

One district court has stood up to this precedent and found that the distinction drawn by these courts is illusory and that the ADA prohibits both discrimination between the disabled and the nondisabled and discrimination between disabilities. *See Lewis,* 982 F.Supp. at 1168–69. That court reasoned that:

> Both a decision to deny coverage on the basis of mental disability and to provide inferior coverage for mental disabilities target the mentally disabled for inferior treatment. In both cases, an insurer has subjected the mentally disabled individual to treatment inferior to that accorded to others solely on the basis of that individual's disability.... Under defendants' logic, an employer could hire an employee with a physical disability over a more qualified employee with a mental disability solely because of the mental disability, without violating the ADA, simply because both applicants were members of the protected class.... [T]he ADA prohibits discrimi-

nation on the basis of an individual's particular disability. Thus, whether a disabled person is treated differently than a non-disabled person or another disabled person, the same wrong has occurred. That is, the person has been discriminated against because of his particular disability.

*Id.* at 1168. The *Lewis* court found that the interpretation of the ADA to permit differentiating between disabilities is not in accord with the plain language of section 12112(a) of the ADA, "which prohibits discrimination against an 'individual with a disability because of the disability of such individual.'" *Id.* (quoting 42 U.S.C.A. § 12112(a)). Although the *Lewis* court discussed the decisions by the courts of appeal in *CNA* and *Parker*, it did not, as it could not, adequately support its position with the ADA's legislative history. The statute's language, cited by *Lewis* as support for finding the distinction clearly laid out in the legislative history illusory, does not provide compelling evidence that the statute must be interpreted as the *Lewis* court contends. Accordingly, the Court finds the opinions of the Third, Sixth, and Seventh Circuit Courts and the legislative history before and subsequent to the ADA more persuasive.[9]

Because the Court determines that there is nothing in the ADA that requires a covered entity to provide the same benefits for mental disabilities as for physical

disabilities, it is not necessary for the Court to determine whether the safe harbor provision for insurers under the ADA applies. Consequently, it is not necessary to examine whether the Defendants may justify their differentiation between mental and physical disabilities under the LTD Plan with actuarial evidence.

According to appellate precedent and the relevant legislative history, there is simply no requirement under the ADA that insurance policies provide the same benefits to all categories of disabled people. The provision of a shorter benefits term to people suffering from a mental rather than a physical disability may be based on antiquated or ignorant beliefs, as Mr. Conners contends. However, this is an argument that is appropriately presented to the legislature. There is nothing in the ADA that requires that any benefit extended to one category of disabled persons also be extended to all other categories of disabled persons. Accordingly, the foregoing is an alternative basis upon which this Court may rest a decision to grant summary judgment in favor of Defendants on Count I and the premise upon which the Court will grant summary judgment in favor of Defendants on Count II.

### B. The MHRA.

■ The MHRA provides, in relevant part, the following:

---

9. The Court notes that the scenario presented by the *Lewis* court—that an employer is free to refuse to hire a more qualified mentally disabled person over a physically disabled person simply because the person is mentally disabled—is not an inevitable result under this Court's interpretation of the ADA. A plaintiff may still sue under the ADA and demonstrate that a covered entity refused to provide him or her with goods, services or employment because he or she is disabled. It remains unlawful for a covered entity to exclude an individual from employment or benefits due to discrimination solely on the basis of the disability. As the Supreme Court recently held within the context of age discrimination, "[t]he fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so

long as he has lost out *because* of his age." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (emphasis added). In the present situation, no individual has been singled out and treated differently because of his or her disability, while in the hypothetical posed by the *Lewis* Court, a qualified individual was not hired because of his disability. Thus, interpreting the ADA to mean that a covered entity may lawfully differentiate between disabilities in providing benefits, services, or goods as long as all individuals are given the same benefits despite their disability status is not in conflict with the premise underlying the ADA that discrimination against an individual with a disability *because of the disability of such individual* is unlawful.

1. Unlawful employment. It shall be unlawful employment discrimination, in violation of this Act, except where based on a bona fide occupational qualification:

A. For any employer to fire or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, physical or mental handicap, religion ... or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment ... because of their race or color, sex, physical or mental handicap, religion....

5 M.R.S.A. § 4572. Under the MHRA, a claim must be filed within two years of the date of the act of the allegedly unlawful discrimination. *See* 5 M.R.S.A. § 4613(2)(c). The Court has determined that Mr. Conners' claim accrued on June 27, 1994, when he was notified in writing that he was subject to the two-year limitation on disability benefits. Mr. Conners filed his Complaint on July 20, 1998, and, thus, failed to file before the statute of limitations on his MHRA claim had run. Accordingly, the Court will grant summary judgment in favor of Defendants on Count III.[10]

### C. ERISA.

In Count IV of his Amended Complaint, Mr. Conners alleges that Defendants' refusal to continue to provide him with disability benefits under the LTD Plan constitutes a wrongful denial of benefits in violation of ERISA. The civil enforcement provision of ERISA provides in relevant part that:

A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [entitled "Liability for Breach of Fiduciary Duty"]

(3) by a participant beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violates or (ii) to enforce any provisions of this title or the terms of the plan....

29 U.S.C. § 1132(a)(1)(B). Mr. Conners alleges that Defendants wrongfully applied the two-year limitation on his disability benefits because they incorrectly determined that he suffers from a mental or nervous disease rather than a physical disability. Amended Complaint, ¶ 36. Mr. Conners' Amended Complaint also sufficiently alleges a claim for breach of fiduciary duty. He alleges that he is entitled to reinstatement of disability benefits, reimbursement for benefits due and not paid, interest, costs, and attorney fees. *Id.* ¶ 39. In his specific request for relief, Mr. Conners also requests "judgment against Defendants Maine Medical Center and UNUM for damages in the amount determined to be caused by the Defendants' discrimination, plus interest and costs, attorney fees, and such further relief as the Court deems just and proper." *Id.* Therefore, a plain reading of Mr. Conners' Amended Complaint demonstrates that Mr. Conners requests *extracontractual* damages—damages in addition to the reinstatement of his benefits and restitutionary relief in the form of reimbursement for benefits due and not paid.

10. Because the statute of limitations is dispositive of Count III in favor of Defendants, the Court will not consider Defendants' additional arguments that ERISA preempts a claim under the MHRA in this case and that Mr. Conner's claim under the MHRA would fail on the merits.

Defendants ask the Court to grant summary judgment against Mr. Conners to the extent that he seeks relief not provided under ERISA, namely "damages ... caused by the Defendants' discrimination." Under section 1132(a)(1)(B), Mr. Conners may recover benefits due to him under the terms of the plan. *See* 29 U.S.C. § 1132(a). This section provides only for the recovery of what is due a plan participant under the terms of the benefit plan and does not support a claim for compensatory damages.

Mr. Conners has also sufficiently alleged that Defendants breached their fiduciary duty against him when they denied his claim for benefits available for physically disabled plan participants. Under section 1132(a)(2), a participant may bring a civil action to recover "appropriate relief under section 1109 of this title," which is entitled "liability for breach of fiduciary duty;" and under section 1132(a)(3), a participant may recover injunctive relief. The issue is, thus, whether a plan participant or beneficiary may recover damages under section 1109(a). The answer to this query is short and clear. The Supreme Court has held that section 1109 is not authority for an award of extracontractual damages to a beneficiary, nor does the legislative history of the section reveal a congressional intent for the judiciary to imply a private right of action to recover damages. *See Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 144, 148, 105 S.Ct. 3085, 3091, 3093, 87 L.Ed.2d 96 (1985); *see also Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (upholding the Supreme Court's decision that an

award of damages to a civil litigant under section 1132(a)(2) in a breach of fiduciary claim is not permitted and holding that a participant may, however, recover equitable relief under section 1132(a)(3) in a breach of fiduciary duty claim). Therefore, although Mr. Conners may pursue his ERISA claims in Count IV, he is limited to recovery of benefits that he is owed under the LTD Plan and may not recover extracontractual damages caused by Defendants' alleged discrimination.[11]

Finally, Mr. Conners presents a labyrinthine argument in support of his right to summary judgment on his ERISA claim in Count IV. In effect, he contends that Defendants have violated ERISA because the LTD Plan violates a Maine law that regulates insurance which is not preempted by section 1144 of ERISA. The Maine law cited by Mr. Conners provides in relevant part that:

> No insurer authorized to transact business in this State may refuse to insure or continue to insure, limit the amount, extent or kind of coverage available to an individual or charge an individual a rate different from that normally charged for the same coverage solely because the insured or the applicant for insurance has a physical or mental handicap, as defined in Title 5, section 4553(7–A)....

24–A M.R.S.A. § 2159–A. The proper way for this claim to have arisen in this case is for Mr. Conners to have brought a state law claim alleging that the LTD Plan violated 24–A M.R.S.A. § 2159–A. Defendants may then have asserted that the claim under the state law was preempted

---

**11.** Instead of addressing Defendants' arguments, Mr. Conners attempts to convince the Court that his ERISA claim is timely. Although Defendants challenged the timeliness of Counts I, II and III, it does not appear to the Court that Defendants challenged the timeliness of Mr. Conners' ERISA claim contained in Count IV. However, the Court finds that Mr. Conners ERISA claim is timely. As discussed, Mr. Conner's claim accrued on June 27, 1994, when he was told that UNUM had classified his disability as mental and he

was subject to the two-year limitation on LTD benefits. Maine has a six-year statute of limitations for all civil actions, which this Court has held applies to ERISA claims. *See Bolduc,* 35 F.Supp.2d 106, 117–18 (D.Me.). Because Mr. Conners pursued his administrative remedies provided under the LTD Plan from approximately January of 1996 through July of 1997, and filed this action on July 20, 1998, Mr. Conners is well within the six-year statute of limitations.

by ERISA, and Mr. Conners may have presented the argument presented here in response. Mr. Conners has disguised this state law claim as a claim under ERISA, rather than presenting, in a straightforward manner, a claim under state law. The Court, therefore, will not consider Mr. Conners' argument that his plan violates 24-A M.R.S.A. § 2159-A because it was not pleaded in the Amended Complaint. Thus, the Court will not grant summary judgment in favor of Mr. Conner's on Count V. As previously explained, Mr. Conners is free to pursue his claim under ERISA as it was presented in his Amended Complaint and to demonstrate that his disability was wrongfully designated as mental and that he is entitled to full-term disability benefits under the LTD Plan.

## III. CONCLUSION

To conclude, the Court **ORDERS** that Defendants' motion for summary judgment (Docket No. 19) be, and it hereby is, **GRANTED.** The Court **FURTHER OR-DERS** that Plaintiff's cross motion for summary judgment (Docket No. 24) be, and it hereby is, **DENIED.** Accordingly, judgment must be entered in favor of Defendants on Counts I, II, and III. Plaintiff's ERISA claim in Count IV remains viable insofar as it does not seek to recover extracontractual damages. Because only the ERISA claim remains, this case will be taken off the jury trial list and scheduled for a bench trial.

**SO ORDERED.**